**001**

People often say that young children forget the hardest parts of their early lives that time softens those memories or erases them completely. I am here to say that isn't true for me. I remember it clearly. I remember the sadness that seemed to sit in our house all the time. I remember the confusion, the silence, and the feeling that something was deeply wrong long before I could understand what it was.

When I was younger, I didn't understand why my family cried so often or why there was always this quiet tension in the air. As I got older, my parents explained what was happening, and the confusion turned into something heavier which was fear, heartbreak, and a kind of awareness that no child is really prepared for. Watching what addiction did to my uncle, and to all of us, is something that has stayed with me in a way that hasn't faded over time.

My bubby was not always the person addiction made him into. I remember spending time with him when I was younger, and even then, I could sense when something wasn't right. At family gatherings or during moments that were supposed to be simple and happy, there was always something "off" about him. As time went on, those small feelings turned into undeniable changes. His appearance declined. His behavior became more unpredictable. The things he did, things that didn't match the person we knew became harder and harder to ignore.

One of the hardest parts for me has been what this did to our family connections. His daughter, who used to be my best friend, is now someone I barely know. That relationship didn't just fade naturally, it was broken by the consequences of addiction. My cousin Demi has gone through more than most people our age should ever have to endure, and the damage done to her and to her mother's side of the family feels deep and, in many ways, lasting. There is also the time we lost—time we will never get back. My family and I missed 32 months of his life while he was in prison. Those months weren't just numbers; they were birthdays, holidays, and everyday

moments that should have been shared but weren't. I remember the phone calls, and I remember crying every time I heard the warning that the call was about to end. Even those small connections were limited, counted down, and cut off.

Although I am grateful to have him back in my life today, and I am proud of the progress he has made, the reality is that the pain did not disappear when he came home. Addiction doesn't just end, it leaves behind consequences that continue long after. From where I stand, I see how hard he has to fight every day just to build a stable life again. I see how much was lost, and how difficult it is to rebuild something that was broken over time.  What happened to my uncle didn't just affect him. It changed my family in ways that are permanent. It shaped my childhood, strained relationships, and left emotional wounds that we still carry. And I know that our story is not unique—there are many families living with this same kind of pain.

I share this not to exaggerate, but to make clear that drugs that were fed to my uncle and many others for pain causes much more suffering than any surgery could cause, and it has real, lasting painful memories and daily struggles not just for one person, but for everyone who loves them. I feel for every family that our systems have failed.

**003**

Your Honor,

My name is Macie Jo Adkins (Thomas) and I am writing to you not just as an individual, but as someone whose entire life has been shaped by the devastation of the drug epidemic.

There has never been a time in my life where addiction was not present. When I was eight years old, my father went to prison because of his addiction. I am now 21 years old, pregnant with my first child, and he is still incarcerated. I have lived my entire life without him, and now I am preparing to raise a child of my own without ever having had my father there to guide me.

Addiction did not stop with him. My grandfather spent his life battling it, and it eventually took him from us. My mother is still actively using, and because of that, I cannot have a relationship with her without feeling pain. Every conversation, every memory, is overshadowed by what addiction has done to her.

As a child, I was placed in and out of the foster care system before my grandmother adopted me at the age of seven. She became my safety, my stability—my home. Now, after everything she has done for me, I am the one caring for her after meningitis took much of her eyesight and hearing. The roles have reversed, but she is still all I have.

The loss in my family does not end there. My brother died at just 23 years old from a brain tumor. At the time, his father was actively struggling with addiction, and he passed away only three months after my brother. I was separated from my siblings when I was adopted, and I had to learn how to live without them, even though they were still alive somewhere in the world.

One of the most painful moments of my life was losing my aunt. She was beaten to death in circumstances tied to her addiction. While she was being life-flighted to the hospital, I had to be the one to tell her children that she was pregnant. Neither she nor her baby survived. No one should ever have to carry that kind of pain, especially not as a young person.

When I was a child, I also found my grandmother on my mother's side deceased due to her addiction. Before that, her husband was sexually abusing me, my sister, and my cousin. We had no one to protect us. There were no stable adults in our lives—because addiction had taken them from us long before they were physically gone.

This is what the drug epidemic looks like. It is not just statistics. It is not just numbers. It is children growing up without parents. It is families being torn apart. It is trauma that lasts a lifetime.

I am now preparing to bring my own child into this world, and I carry fear with me every day. Fear of the cycle. Fear of the pain. But also determination—because I refuse to let this

continue. I want something better for my child. I want them to grow up safe, loved, and protected in ways that I was not.

Your Honor, I am asking you to truly see the human cost of this epidemic. My story is just one of many, but it is real, and it is ongoing. The damage done reaches far beyond the individual—it destroys generations.

I stand here today not just as a victim of this crisis, but as someone trying to survive it and break free from it.

Thank you for taking the time to hear my story.

Respectfully,

Macie Jo Adkins (Thomas)

**005**

**From:** ▮▮▮▮▮▮▮▮▮▮
**To:** Victimassistance Fraud (CRM)
**Subject:** [EXTERNAL] Victim Impact Statement – PUBLIC
**Date:** Monday, April 13, 2026 11:38:28 AM

My name is April Babcock. I am the founder of Lost Voices of Fentanyl, a national nonprofit built out of unimaginable loss. I am also the mother of my son, Austen, who died in January 2019 from illicit fentanyl poisoning.

Austen was not prescribed opioid medications. He was not part of the system in the way many people expect. But he was still a victim of the system that companies like Purdue Pharma helped create.

Before he died, there was a time when Austen took pills like Percocet and Xanax. Like so many young people, he believed they were not truly dangerous. He believed they were "just pills." That belief did not come out of nowhere—it came from a culture that normalized pill use, a culture built over years by pharmaceutical companies that flooded this country with opioids while downplaying their risks.

That normalization is what led to the next phase of this crisis.

Because once the system was flooded, once the perception was created that pills were safe, the transition was inevitable. Real pills became harder to get. Counterfeit pills flooded the streets. And those counterfeit pills are now laced with illicit fentanyl—killing people like my son.

My son did not die from a prescription bottle.

He died from the aftermath.

And that matters.

What Purdue Pharma did did not stay contained within doctors' offices or pharmacies. It spilled into our communities, into our schools, into our

children's lives. It changed how an entire generation viewed drugs—especially pills. And that shift is still killing people every single day.

Since losing Austen, I have spoken to thousands of families across this country. I run one of the largest fentanyl-focused groups in the nation. I read their stories every day. I hear from parents whose children, just like mine, never had a prescription—but are gone forever because they trusted something they thought was safe.

This is not just about addiction.

This is not just about prescriptions.

This is about a chain reaction that was set in motion—and has never been stopped.

Over 100,000 Americans are dying each year. Many of them are not addicts. Many of them are young people experimenting, coping, or simply trying to fit in—just like Austen.

The damage done by Purdue Pharma did not end when prescriptions slowed. It evolved. It escalated. And it became deadlier than anyone could have imagined.

My son's life mattered.

His death should have never happened.

And neither should the thousands of deaths that continue to follow the same path.

I am asking this Court to recognize the full scope of harm—not just the first wave of this crisis, but the devastating second wave that continues to take our children.

Because this didn't end.

We are still living it.


Respectfully,

April Babcock

Founder & President

Lost Voices of Fentanyl



Sent from my iPhone

**006**

# Victim Impact Statement – Purdue Pharma Settlement

My name is Susan Bartz Herrick. I am the mother of Luke.

Luke was an entrepreneur, a scratch golfer, and a highly intelligent man. But more than that, he was my son. He was loved deeply. He had a future. He had a life that should have unfolded.

What happened to Luke began after a near-fatal car accident. He survived that accident, but it marked the beginning of a path neither of us understood at the time.

In the aftermath, he entered the medical system for treatment and pain management. Like so many others, he was prescribed opioid medications by physicians we trusted. Over time, those prescriptions increased—eventually reaching extraordinarily high daily doses of oxycodone.

We did not understand what was happening to him. We were not warned in any meaningful way. We trusted that what was being prescribed was safe.

Then everything changed.

The same system that had sustained that level of prescribing pulled back, and patients like Luke were left to navigate dependence and withdrawal largely on their own. There was no clear path forward. No guidance that matched the seriousness of what had been set in motion. As his mother, I was left trying to help him through something I did not understand and had never been prepared for.

I need to say this clearly:
This was not a moral failure.
This was a disease.

And it was a disease that was, in part, driven by misinformation—by the way opioid medications were presented to physicians, and by the reassurances that minimized the true risk of addiction.

The consequences of that misinformation were not abstract. They were human. They were personal. They reached into my home and into my son's life.

I lived through years of watching Luke struggle—wanting to be free of something that had taken hold of him. I lived with the fear, the confusion, the hope that things would turn, and the heartbreak when they did not. There is a particular kind of helplessness in watching your child suffer and not being able to save him.

That helplessness does not end.

The loss of my son is not something that can be placed in the past. It is present every day. It is in the silence where his voice should be. It is in every family gathering where he is missing. It is in the quiet moments when the reality returns—again and again—that he is gone.

Grief like this is not an event. It is a condition of living.

No settlement can restore Luke's life. No resolution can return what was lost. But it matters that the truth is acknowledged—that the chain of decisions, misinformation, and influence that helped create

this crisis is seen for what it was.

Luke's life mattered.
What happened to him matters.
And the impact of these actions does not end with this case. It continues in the lives of the families who carry this loss forward.

Respectfully submitted,
Susan Bartz Herrick

**007**

**UNITES STATE v. PURDUE PHARMA L.P.**
**DISTRICT OF NEW JERSEY**

**To: Mr. Robert Frazer, Attorney for United States**
**UNITED STATES DEPARTMENT OF JUSTICE**
**970 Broad Street, 7th Floor**
**Newark, NJ 07102**

**Ronald Bass, Sr., "Victim Impact Statement"**
COURT DOCKET NUMBER: Cr. 20-1028(MCA)

Dear Mr. Frazer

I am/we are creditor(s) and claimant(s) in the Purdue Pharma, L.P., ongoing litigation in the civil and criminal proceeding, as well as the Bankruptcy matter pending before Judge Sean H. Lane, U.S.B.J., in White Plain's New York ; I have participated in these litigations of Purdue Pharma, L.P., et al., matter(s) before Judge Robert D. Drain and Judge Colleen McMahon of the Southern District of New York, and prior to the district court's litigations I have filed my complaint with the Judicial Panel on Multidistrict Litigation, see attached the Panel decision and reason, in which I have been diligently trying to resolve of the impact of my prescribed medications manufactured by Purdue Pharma, L.P., et al.

I'm writing this impact statement in connection with Purdue Pharma L.P., criminal matter, which should be viewed on a wider-level perspective, rather than pointing out one individual- virtual person-Purdue Pharma and contributed the negative consequences for its conduct of the global settlement to shield stakeholder contrary to the 11 amend., waiver of their immunity.

I, respectfully submit this victim impact statement for consideration at sentencing. I was harmed by prescription opioid-related conduct and consequences have affected nearly every part of my life.

As a result, I have suffered significant financial loss, damages to my employment opportunities, housing instability, and discrimination. I have also experienced harm to my family relationships and family unification, and I have lost opportunities to participate in federally funded programs and other public benefits that could have helped me recover and rebuild my life.

I have been mistreated by state agencies and by systems that failed to protect my rights and dignity as a father who have been diligently seeking unification with his biological son. My medical records and related (NCIC)information has not been handling appropriately, and I have concerns about improper access, records discrepancies, and false or misleading information being used against me, this has caused me stress, confusion, and further harm to my reputation and standing in the community, the cumulative effect of these action has been falsely manipulating the system, by impairment of my character, to the extent that my records were improperly accessed, retained, disclosed, or use, that conduct was unlawful and harmful, I further believe that billing for services I never received, or the submission of false or fraudulent claims, has contributed to the damage done to me and to the integrity of the system that was supposed to protect me.

I also experienced defamation of my character, due to my addiction and recovery which has damaged how others view me personally and professionally. These harms have not been limited to one moment in time; they have continued and compounded over the years. Contrary to ADA.

I ask the Court to consider the full human impact of this case, besides Purdue Pharma L.P. ( I am not referring to the Sackler's family) including the long-term damage to victims like me. I respectfully request that the Court impose a sentence that reflects the seriousness of the harm caused and the lasting consequences that shall bring in Stakeholders of Public and Private Entities and their employees of New Jersey who were responsible for the administrative regulations of controlled schedule II substance distribution that have affected individuals and families, which the State of New Jersey Medicaid-Family Services have contributed to the opioid injuries.

I am requesting the Attorney for the United States Department of Justice, and the U.S. District Court to hold responsible the individual or group of person who falsely accused me of an criminal investigation prosecuted in Judge William J. Martini, U.S.D.J., at my custody hearing in the State of New Jersey Superior Court-Law Division-Family Part and amongst other constitutional violation of my rights of due process, which went beyond judicial abuse and abuse of discretion to Threaten a parent because of a court order urine collection you're going to take their child willingly or unwillingly.

One specific paragraph page 1 last par. Onto page 2 and "cloud based electronic health records platform, contrary to Title 42 United States Code, Section 1320a-7b, in violation of Title 18, United States Code, Section 371 it has been submitted on my medical records condition to justify over-billing Medicaid for life threatening condition of diseases, infliction, infectious diseases, chronic disease, mental health conditions, Immune/Chronic disorder, viruses and criminal activities, and falsifying allegations of antisemitic terms, phrases.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully,

Ronald Bass, Sr.



**Attached Supporting Documents:**

1. Judicial Panel of Multidistrict Litigation.
2. United States Court of Appeal for the Federal Circuit/U.S. DOJ's Brief.
3. Plea Agreement of Purdue Pharma-Cr. 20-1028(MCA).
4. State of New Jersey Providers Medicaid Claims.

*Ronald Bass, Sr.*

**008**

| | |
|---|---|
| **From:** | Chris Battin |
| **To:** | Victimassistance Fraud (CRM) |
| **Cc:** | ███████████████████ |
| **Subject:** | [EXTERNAL] Subject: Victim Impact Statement (Deceased) - Purdue Pharma L.P. - Lynne Bender |
| **Date:** | Monday, April 13, 2026 9:31:16 PM |

**Subject:** Victim Impact Statement (Deceased) - Purdue Pharma L.P. - Lynne Bender

# Victim Impact Statement: Purdue Pharma L.P.

**Case:** USA v. Purdue Pharma L.P.

**Subject:** Victim Impact Statement (Deceased) - Purdue Pharma L.P. - Lynne Bender

### Victim Impact Statement: Purdue Pharma L.P.

**Case:** USA v. Purdue Pharma L.P.

**Regarding:** Lynne Bender **(Deceased) Date of Birth:** 09-09-92

**Date of Death:** 02-21-24

**Regarding:** Lynne Bender **(Deceased) Election: PUBLIC**

**Statement of Impact** The following is a record of the preventable death of Lynne Bender. Her life was "stolen" by a system that traded human safety for administrative convenience —a system fueled by the opioid crisis the defendant admitted to exacerbating.

**The Human Cost: A Life Stolen * A Commitment to Recovery:** Lynne Bender was "committed to recovery" and had a "vibrant spirit," with the lifelong goal of "becoming a NICU nurse" to care for the most vulnerable.

- **The Final Admission:** During her final admission at a treatment center, Lynne was "involuntarily discharged following an unverified suspicion of contraband."

- **The Act of Abandonment:** This "curb-side discharge" and "systemic failure" left her "vulnerable" and "abandoned" without clinical stabilization or a safe hand-off to family or another facility.

- **The Result:** This abandonment "ultimately leading to her death," ending her pursuit of a nursing career and leaving a permanent void in the lives of those who loved her.

**The Need for Accountability and Change (Lynne's Laws)** The defendant's admitted marketing practices and "dual-object conspiracy" created the very crisis that overwhelmed the facilities meant to protect Lynne. Because of the "patterns of systemic neglect" and "institutional discharge protocols" that failed her:

- I am currently documenting these failures to advocate for **"Lynne's Laws"** in Pennsylvania. This legislative work is a direct response to the "pattern of facility failures that trade human safety for administrative convenience."

- We are seeking to mandate "family notification" and "end curb-side discharges" so that no other patient faces the "patient abandonment" that stole Lynne Bender's life.

**Conclusion:** The death of Lynne Bender was not an isolated accident; it was the "preventable" result of a crisis that the defendant helped build and profit from. Her story is an "indictment of current institutional protocols" and serves as the foundation for our demand for national accountability.

**Submitted By:**
Christopher W. Battin

██████████

████████████████████████████

██████████████████

**Director, Lynne's Laws Advocacy Email:**

████████████████████████

**I am also providing notice of my desire to provide an oral statement at the April 21, 2026 sentencing hearing.**

**009**

April 16, 2026

Honorable Judge Madeline Cox Arleo
U.S. District Court for the District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07102

U.S. Department of Justice
Criminal Division, Fraud Section
10th & Constitution Avenue, NW
Bond Building, 4th Floor
Washington, DC 20530

Re:  Purdue Pharma 2:20-cr-01028-MCA Victim Statement

Dear Honorable Judge Cox Arleo:

My only son, Eddie, just a high school student, died in his bed on President's Day 2001.  That was the day I first ever heard the word OxyContin.

After Eddie's unimaginable death, I immediately started to warn kids about this new deadly drug by faxing every local high school that very night.

I attended the first Congressional hearing on OxyContin deaths in August of 2001 which was held in Bensalem, Pennsylvania, just months after a pill mill doctor was arrested for flooding my Philadelphia neighborhood with OXY.

This was the first of many congressional hearings that did not result in any real consequences or deterrents.

At the very first hearing it was revealed Purdue knew about the off the charts prescribing of this pill mill doctor through IMS data but said nothing to the authorities.

In 2007, I gave a victim's statement at the Abingdon, Virginia, sentencing hearing where Purdue Pharma pled guilty to felony crimes but just paid some fines.

It was later revealed the brass at the DOJ withheld a 120-page prosecution memo detailing many more serious felony crimes than what they plead guilty to but the judge, nor the victims' families, were never made aware of this memo.

I say - Deadly crimes should never equal just fines.

Yet, here we are again today where Purdue is facing - just fines for deadly crimes.

Purdue Pharma 2:20-cr-01028
MCA Victim Statement                          Page 2                          April 16, 2026

Purdue and their owners have made a mockery of the justice system by violating their 2007 sweetheart plea deal before the ink was even dry.

Now they are pleading guilty again to very similar crimes.

When I read that Purdue Pharma was declaring bankruptcy, I called it a bankruptcy scam because I knew it was all about avoiding accountability for their deadly crimes.

Many books, documentaries, miniseries and news articles have documented their crimes.  It has also been reported that they will pay the proposed fines and bankruptcy with the interest they made on offshore accounts.

I call that blood money.

Many others have detailed why the Bankruptcy is a SCAM but as far as their criminal plea it confirms this old saying, "Punishable by fine means it is legal for a price," is true.

Fines, no matter how big, are not a deterrent but part of a money-making business model no matter what the harm to society.

I implore the court to reconsider the plea agreement.

Say No to JUST FINES for their deadly crimes!

Respectfully,
Edward J. Bisch
(Eddie's Dad)

**011**

My name is Joyce L. Rucker-Brooks

I was hooked on pain meds for over 35 years. These were prescriptions.
It was so bad i even bought from off the street too.
But the doctors usually wrote as much as i needed and could afford to pay them for. I ruin my entire life. End up on mental medication. Different sickness & ailments. I cant believe the way the united states operates now. As long as you are lining our representatives & senators pockets you will let them disable and abuse the people of our societies bring disfunctions and cripple our peoples that should be able to keep this country strong. But greed and the  companies that does wrong to its own people should no longer be allowed. I had great potentials when I graduated from high school. Big dreams, hope, joy & smarts. Over those 35 years I worked just to support my habits.
Homeless for over 15 years. I just begin to live again in last 6 or 7 years.
But still too old to do a Lotta things to bring me the kinna peace I look for. The years I have left, I try to help as many ppl as I can, when I can. But I also tell them about the drug (pill) world as much as I can & often as I can. I can look at people & tell.......

Joyce brooks

**012**

| | |
|---|---|
| **From:** | Jason Brown |
| **To:** | Victimassistance Fraud (CRM); ███████████ |
| **Subject:** | [EXTERNAL] Hi, my name is Jason Brown |
| **Date:** | Saturday, April 11, 2026 12:27:02 AM |

Where do I begin this drug and other painkillers like it OxyContin Percocet, Vicodin, benzos, Suboxone, oxycodone methadone and other generic names for them all the first time I was ever prescribed. That was age 14 for a toothache. I am 39 years old today. I took Suboxone for 18 years and I've been on methadone for one. I lost everything over this drug and I've been incarcerated also over this drug my wife who was 35 years old her name was Charlene and she died from an overdose at the age of 35 that was four years ago and my father, who also died due to drug use of these drugs and it slowly kill them, but he died at 56 years old and me myself these drugs have put me in detox. They have put me in jail. They have ruined my name. They have made my disabilities so much worse when I thought I was just self medicating. I started using this class of drugs at 13 years old my my father who had an aneurysm and his head got prescribed Percocet, which led to Dilaudid and one day I decided to go into the room and steal some blue pills that had a five on them and said Percocet I was so young that I couldn't even read the word Percocet and it totally ruined my life. It put me in jail like I said earlier it put me in rehab it made me get a divorce from my first wife who we had three kids together and then it gave one of my kids who is six autism because she was using Klonopin prescribed to her Neurontin, other than no other Name is gabapentin. The doctor also had her on Subutex watch my little daughter who I lost custody of who lives out in a different state with family, my daughter and my youngest son out of my five kids them two kids I had with my wife who passed away and from there, I had to make the tough choice of doing an open adoption with my cousin in a different state to give them a good life. They still know me as dad Thank God, but it's depressing every day to live and to go on living, knowing and live through everything. This drug has put me through to me. The makers of these drugs should be put in jail for the rest of their life for the harm they caused they used to walk around my neighborhood, knock on peoples doors that would prescribe go, Vicodin and Percocet and tell them that OxyContin was not addictive like Percocet now let me tell you I detox from a lot of things. OxyContin is a much worse detox and more days than Percocet and then Suboxone and methadone even worse. We're talking 16 days sick detox from them to drugs not four days like we were told from these pill pushes that worked for the pharmaceutical company I could go on forever with my story so far as I'm working with my friend that is a director of a movie named methadone Mile and also the second movie that was filmed in my house. The name of that is gonna be Fetty anyways that's how bad it touched me. I'm no longer working. I'm mentally disabled and physically even though I still don't collect disability, I just had my hearing a few weeks ago so I'm hoping I get approved. I've been waiting since 2022 with no job and no way to take care of myself besides snap the food program and I have a voucher that helps me with my rent now I never plan to live like this I planned for the white picket fence happy family, but you know what I didn't get that. I got my first 10 year marriage and I completely ruined it over drugs and my three all this boys who are 19 in a set of twin 17 I had a teach them about everything I went through and worry and constantly worry that they would grow up to be different people and thank God they did they thank God they are shining like little stars right now and as far as my two youngest out of the five, they're in Arizona with my cousin Scott and they are getting the best life because I get FaceTime them and talk to them like I said I'm still their dad and they know me as that, it's just DCF wouldn't put them back in my custody after my wife overdosed in my house and I found her again at 35 years old. I could sit here and go on and on and on, but what I would like to say to the makers of these

drugs is you should be ashamed of yourself I'm Christian so I forgive you as hard as that is to say, but how could you be so greedy to make money off of a pill that ruins not just your life but everybody around you thank you for the time if I keep going, I'll write you a novel so I'm gonna end it here and to me this lawsuit is a no brainer and it will never be enough to bring back my wife to bring back my father and to bring back all the time I lost. I must've lost 18 years out of my 39 to these drugs and I'm suffering a bunch of different problems sleep apnea bad dreams, recurring where I fight in my dreams, posttraumatic, stress, anxiety, depression, bipolar, ADHD OCD and so much more. I'm still on methadone 18 years later I was on Suboxone for 17 years. My life wasn't supposed to go this way. I was pretty much given the life that people dream of of being in movies and making movies and instead I chose these drugs and I'm trying to get back to my right life now and every day is a struggle. Thank you for the time of hearing and a quarter of my story.
Jason J.Brown
null

*UNITED STATES v.* Purdue Pharma L.P. _____

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA _____

VICTIM NAME: Jason Brown _____

**Please select one of the following as it relates to your statement that follows:**

☐ I want my statement to be PRIVATE (only accessible to the court, the government, and the defendant)

☐ I want my statement to be PUBLIC (made publicly available on the court docket)

# Public

**I would like to be <u>considered</u> to provide an oral statement at the sentencing hearing on April 21, 2026:**

☐ Yes

☐ No

> ➢ Please note the court has advised that anyone who wishes to make an oral statement <u>must</u> elect to have their statement made public. In addition, the court has determined that it will allow a limited number of individuals to speak at the sentencing hearing. If you are selected to provide an oral statement, you will be informed in advance.

Purdue Pharma L.P.

*UNITED STATES v.* _____

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Jason Brown _____

## VICTIM IMPACT STATEMENT

*Completing this form is optional and the questions serve as a guide for potential issues that you and/or your family may have encountered as a result of the offense. Please feel free to draft a letter or submit a Victim Impact statement another way instead of using this form.*

How have you and members of your family been affected by this crime? Feel free to discuss how the crime has affected you and/or your family's health and lifestyle.

My wife, Charleen Brown, who passed away, my father, James Brown myself Jason Brown

Have you and/or members of your family received counseling as a result of this crime?

☐ Yes ☐ No

If yes, please explain:

Yes I receive counseling twice a month and my psychiatrist once a month

*UNITED STATES v.* Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Jason Brown

## VICTIM IMPACT STATEMENT

If you and/or a family member were a patient of the defendant, did you and/or the family member express any concerns to the defendant in relation to the charged conduct?

☐ Yes ☐ No

If yes, please explain:

Do you believe the defendant began or contributed to you and/or your family member's addiction?

☐ Yes ☐ No

If yes, please explain:

Oh yes, 100% they used to walk around and pretty much give OxyContin out to anyone that was prescribed Percocet. They are so responsible and all this they created a whole generation of addicts. ☐

Did the defendant prescribe or dispense drugs that resulted in death or bodily injury?

☐ Yes ☐ No

If yes, please explain:

Yes my wife overdosed from drugs, this Class drugs and this class of drugs, slowly killed my father as well as myself ☐

*UNITED STATES v.* Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Jason Brown

## VICTIM IMPACT STATEMENT

Do you believe the defendant failed to provide necessary care?

☐ Yes   ☐ No

If yes, please explain:

Yes most definitely ☐

Did the defendant bill you and/or your family member's health insurance for unnecessary procedures or procedures that were never performed?

☐ Yes   ☐ No

If yes, please explain:

I would say yeah ☐

Have you experienced any of the following reactions to the crime:

☐ Anger   ☐ Anxiety   ☐ Fear   ☐ Grief   ☐ Guilt   ☐ Chronic Fatigue

☐ Sleep Loss   ☐ Addiction   ☐ Appetite Change   ☐ Sickness

☐ Trouble Concentrating   ☐ Financial Stress   ☐ Depression

Please describe any other reactions to the crime committed.

All the above ☐

*UNITED STATES v.* Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Jason Brown

## VICTIM IMPACT STATEMENT

Do you feel the defendant is or will be a threat to you, your family, or the community?

☐ Yes  ☐ No,

If yes, please explain:

Yes, most likely ☐

What else would you like the Court to know about the defendant or your situation as a result of the crime?

I wrote it all in an email that was sent in before this form ☐

If a victim consents, the Court may also make restitution in services in lieu of money, or make restitution to a person or organization designated by a victim. If you are interested in this option, please explain.

Yes, I had to pay on my credit card for my wife's funeral. I had a pitch in for my father's funeral both because of these plastic drugs and the lifestyle I had to live for the past 22 years. ☐

**UNITED STATES v.** Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Jason Brown

## VICTIM IMPACT STATEMENT

Please list your actual financial losses from this crime. List only those items for which you have not been or do not expect to be repaid. Please attach receipts or other records that document your losses whenever possible. Please differentiate any monies already repaid by a defendant.

I lost multiple apartments. I lost time by being incarcerated. I lost my family and my children. I lost everything that somebody could hold dare to their heart these days. I am so numb. You could throw a rock off of me and I won't feel it. That's how much damage I have. ☐

Have you been assessed any additional taxes, penalties, or interest by the federal government as a result of this case? If yes, please explain.

No

Have you or anyone on your behalf initiated civil action against any party as a result of this offense? If yes, please state the case name, docket number and court of jurisdiction.

I don't know how to answer this question but no, I have not received any money for this ☐

If you have suffered any other expenses as a result of this crime, please list them below. Include such items as counseling, medical bills, lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. Please be specific and attach copies of receipts if possible.

I have suffered so much and in my note that I wrote in an email should explain everything I've been through with my wife overdosing at 35 on this plastic drugs me overdosing and being in jail and an institutions losing my kids, losing my family, losing my wife, my father dying as well as my wife over this class of drugs. The list just goes on and on and on there's no amount of money that could bring back everything that I have lost ☐

**013**

Andrew R. Browne



4-10.2025

Subject: Statement Regarding Personal Impact and Damages

Dear Honorable Judge

My name is Andrew R. Browne. I am the father of Cameron Zoey Browne (18) and ▮▮▮▮▮▮ (13). I respectfully submit this letter to explain the impact that long-term prescribed opioid use has had on my life and my family.

In 2008, I was diagnosed with three herniated discs and three bulging discs. At that time, I was prescribed high-dose opioid medication for pain management. I was advised that this treatment was necessary and safe for long-term use. Over the years, I expressed concerns and asked about alternative treatments, but I was repeatedly told that I would need this medication indefinitely.

For many years, I remained at home as a full-time parent, caring for and raising my two daughters.

On April 1, 2016, I was removed from pain management after testing positive for morphine. In the weeks that followed, I began experiencing severe mental and emotional instability, including confusion and erratic behavior. This resulted in multiple institutionalizations, including approximately 14 days in a mental health facility, 80 days in Bucks County Jail, and additional treatment at a mental health facility in Dunwoody, Georgia.

For approximately a year and a half, I struggled with significant cognitive and emotional impairment. I have since undergone approximately six years of therapy and have been informed by medical professionals that my condition was related to disruptions in dopamine and serotonin levels.

As a result of these events, I lost my marriage, custody of my children, and nearly all of my personal property. I have also lost meaningful contact with my daughters for nearly ten years.

My family has spent approximately $60,000 on custody-related matters, and the emotional loss I have experienced is immeasurable.

While I understand that no financial amount can restore the time lost with my children or repair the damage done, I respectfully submit that significant compensation is warranted  given the extent of harm to my life, health, and family relationships.

I appreciate the Court's time and consideration of my circumstances.

Respectfully submitted,

Andrew R. Browne

**014**

**Impact Statement Regarding Andrew Browne**

To Whom It May Concern,

I am writing to share the devastating impact that the prescription drug OxyContin has had on my brother-in-law, Andrew Browne, and our entire family.

Andrew was, for many years, a hardworking, responsible man who ran his own successful business installing and running large-scale audiovisual equipment for various conferences, events, and even the summer Olympic games in Atlanta. He took pride in his work, supported his family, and was a dedicated father. When he injured his back, he did what any responsible person would do… he sought medical care and trusted his physician.

At that time, his doctor prescribed OxyContin and repeatedly assured him that it was safe and non-addictive. His back pain was severe and his pain difficult to manage, forcing him to liquidate his business and become the full-time daytime caregiver to his 2 young daughters while his then-wife worked to support the family. Over time, his dosage was steadily increased. Andy trusted his doctor and followed medical advice, never imagining that the medication he was prescribed would lead to addiction. He was following doctor's orders.

As we now know, OxyContin is highly addictive. Andy became dependent on it, requiring higher and higher doses. Eventually, his addiction progressed to the point where he began supplementing with other opioids, including morphine. This was not a reckless choice - it was the behavior of someone already deeply dependent on a substance that had been prescribed and endorsed as safe. Andy was not

When Andy was ultimately removed from his pain management program, he was forced to stop the medication abruptly. The withdrawal was severe and overwhelming, with symptoms so extreme they mimicked serious mental health conditions such as bipolar disorder. During this time, he was not himself. He was suffering from a powerful physical and psychological dependence. The consequences were catastrophic.

Andy lost his ability to function in daily life. As his addiction worsened, his marriage fell apart. Despite efforts by his wife to help him in the beginning, the addiction had taken hold in a way that was beyond what anyone at the time fully understood. His wife became bitter and resentful of him. She began alienating him from his children under the guise of protecting them from him. He lost custody of his children and has not seen or spoken to them more than a handful of times via various counselors in over nine years. There are no words that can fully describe the loss of nearly a decade of a parent-child relationship. Those are years that cannot be recovered - birthdays, graduations, school dances, milestones, everyday moments that make up a childhood. The damage is permanent and irreparable.

At the time Andy was prescribed OxyContin, families like ours did not know what we know today. The medication was presented as a breakthrough - a safe, effective solution for pain. In

reality, it destroyed lives, including Andy's. The aggressive promotion of this drug to physicians led directly to patients like Andy being placed on a path toward addiction.

Andy is, in many ways, a survivor. Given the severity of his addiction and the difficulty of his withdrawal, it is remarkable that he is still alive today. He has worked hard to rebuild his life, but the losses he suffered can never be fully restored.

He lost his business, his financial stability, his home, his reputation, and most tragically, his family. No amount of compensation can return what he has lost… especially the years with his children. But it is important that the full extent of this harm is recognized. Andy's story is not one of personal failure. It is the story of a man who trusted his doctor, followed medical advice, and was ultimately harmed by a medication that was misrepresented as safe.

I share this statement so that his experience, and the profound impact it has had, can be fully understood and considered.

Sincerely,

Lorrie Browne

Sister-in-Law to Andrew Browne

**015**

*UNITED STATES v.* Purdue Pharma L.P.

COURT DOCKET NUMBER: 2:20-cr-01028-MCA

VICTIM NAME: Patrick James Burke Dolan - Deceased 5·19·19

Person Submitting: Mother of Deceased "Glynis J Burke"
— Claim —

**Please select one of the following as it relates to your statement that follows:**

☐ I want my statement to be PRIVATE (only accessible to the court, the government, and the defendant)

☒ I want my statement to be PUBLIC (made publicly available on the court docket)

**I would like to be <u>considered</u> to provide an oral statement at the sentencing hearing on April 21, 2026:**

☒ Yes

☐ No

➢ Please note the court has advised that anyone who wishes to make an oral statement <u>must</u> elect to have their statement made public. In addition, the court has determined that it will allow a limited number of individuals to speak at the sentencing hearing. If you are selected to provide an oral statement, you will be informed in advance.

*UNITED STATES v.* Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Patrick James Dolan Deceased 5·19·19

**VICTIM IMPACT STATEMENT**
SUBMITTED By Glynis J BURKe - MOTher

*Completing this form is optional and the questions serve as a guide for potential issues that you and/or your family may have encountered as a result of the offense. Please feel free to draft a letter or submit a Victim Impact statement another way instead of using this form.*

How have you and members of your family been affected by this crime? Feel free to discuss how the crime has affected you and/or your family's health and lifestyle.

Life CHanging : Then + Now -
the ultimate loss of Death, Breaking up the Family
EMOTional up heAval, Duress + stress + Suicidal ideations
Between the 5 Remaining Immediate family members.
DePression - Despaie etc.

Have you and/or members of your family received counseling as a result of this crime?

[X] Yes [ ] No

If yes, please explain:
My② Daughters Receive counseling. - My Husband
needs counsel
Ano other members
I attend Hospital grief support
Among Many other ModAlities

*UNITED STATES v.* **Purdue Pharma L.P.**

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Patrick James Dolan - Deceased 5·19·19

**VICTIM IMPACT STATEMENT**

SUBMITTED By Glynis J Burke - Mother

Please list your actual financial losses from this crime. List only those items for which you have not been or do not expect to be repaid. Please attach receipts or other records that document your losses whenever possible. Please differentiate any monies already repaid by a defendant.

We Have spent Hundreds of thousands of Dollars on Medical expenses & Rehabs over the course of my "late" son's

Have you been assessed any additional taxes, penalties, or interest by the federal government as a result of this case? If yes, please explain. Addiction

NA

Have you or anyone on your behalf initiated civil action against any party as a result of this offense? If yes, please state the case name, docket number and court of jurisdiction.

NA

If you have suffered any other expenses as a result of this crime, please list them below. Include such items as counseling, medical bills, lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. Please be specific and attach copies of receipts if possible.

Counseling For My Daughter @ 12,000 per year since 2019 -

Where does begin?

How it all began or how it all ended?

It was my son's first year and first month of college, September 2011. He slipped on a muddy hill at SUNY Delhi, on a rainy day and broke his wrist. He went to the local hospital and was prescribed an opioid. The next day, I picked him up and brought him to see an orthopedist back home in NJ. The break required surgery, pins and screws. PATRICK again was prescribed an opioid.

Being a concerned parent at that time and worried about potential harm with prescription medications, I kept the pain meds in my possession and doled out as needed. Pat was unable to drive for a couple of weeks so I drove him back to school. What stood in my brain that day was the 45 minute argument centered around the pain meds that occurred just before we parted. At this point in time, PATRICK was not in pain with a hard cast and complete immobilization. Cumbersome yes but not in pain. Yet he "needed" those pain meds. What ended in an argument about how many pills he would be receiving was the beginning of a long, slow, painful, insidious,ugly, down spiral of a dance with opioid addiction... Little did I know the seed was planted and the course of history for ever changed... What PATRICK also learned at school that month, was that crushing an OXY and snorting it made him feel really good and relaxed and comfortable in his own skin and something that he could not live without IMMEDIATELY. I only know this because PATRICK confided in me that grim truth. The savage battle of fighting the demon was well underway...

May 19, 2019
-Three days after my birthday
-Seven days after Mother's Day
-Nine days before his older sister's birthday.
-21 days after his and his twin sister's birthday. April 29,
FOREVER 26.

Forever etched into my brain is the bloodcurdling shriek of Pat's sister, Meghan, dropping to her knees, screeching, bloody murder "MOMMMM!!!!!"
I screamed back at her. "What is it?, What is it?" I pleaded. "What is it, What is it? Is it PATRICK? Is he gone?" ... I KNEW.

At that same time, my husband was home and he received a call and "THE" knock at the door.
...From the Newark medical examiner.
He thought it was a prank call...
He also recalled late in the morning thinking  what a beautiful day it was, similar to 911, not a cloud in the sky, and consciously sat and thought how his son seemed to finally be doing so well.
My husband cannot speak of that day .....
THEN IT WAS OVER

On May 18, PATRICK and I spent the whole day digging holes, gardening and preparing to plant. At the end of the day, 5 PM to be exact, PATRICK took a shower and get gathered his things. I remember looking at him saying to myself at that moment; "We have our son back. He looks good and is healthy." "Miracles do happen"

As he was leaving, I said to him, "Hang on a minute, I have to document this", and he smiled, put on his shades and posed for what would be THE LAST photograph I would take. His last words to me were, "Bye, mom love you".

What happened between then and the early morning of May 19 changed our lives forever. Our son went back to his Sober Living home by 9:30 and was found in the bathroom early in the morning of May 19, the only room without camera.

Nine years and 28 rehabs, detoxes and stints a of homelessness... 10 years, 11 years... A lifetime of Families Anonymous, Alanon, AA, NA, programs, retreats, trying to survive through family. Besides being robbed of his life, we were robbed of those years together, precious irreplaceable time as he tried and tried and tried to beat the devil of addiction while coming of age.  Patrick and his loved ones lost all those years of being together, a young man growing up struggling. The impact this has had on me and my family cannot be measured. It cannot be put
Into words

Life as I knew it... Life we knew as a family was over on May 19, 2019.
Then and now

There is no rebuilding... There is a gaping hole. There is a vacant lot that cannot be built upon. How do we carry on? Sackler/ Purdue Pharma  greed, progress and tunnel vision is what paved the way from my son's death and the hundreds of thousands of  other loved ones unwittingly take down and ripped from this earth.

My barometer of "What is important" and "What matters in life" has changed dramatically. Ask any mother who lives this nightmare.
Pick any encounter...
An unnecessarily long line, people driving with road rage, acquaintances ranting about jobs, money, or events not turning out to their liking... Every day breeds comparison after comparison to my catastrophic loss.
PATRICK WALKS WITH ME EVERY DAY.
Endless conversations are had. "Would PATRICK want me to live like this?" "What would PATRICK say?"  Shelves of grief books, Buddhist teachings on how to live through difficult times, life, pain and suffering on a daily basis...
"Where do we go from here? How do we function? How do we deal or not deal? What about the rest of the family, How can we go on?.. Collateral damage..."

",Pick up the Conversations with oneself... Survival.. or NOT.

How has this impacted me?
..Ambiguous loss...

The loss of what will never come to be. My son said to me, "I'm going to have five kids, Mom?
"Mom, you know, someday I'm going to be running this business?
And two months before he died...
"Mom, I want to go into the  high school, NVD and I want to talk to the kids and tell them one on one what it's like so they know and understand"...
PATRICK did go to the high school that day to meet with the principal and discuss this plan, but he was locked out. You see, since he had been away for several years, meaning eight years... Things changed. The school doors were locked, there were security officers, hall guards  and metal detectors beyond those locked doors. Patrick could not gain entry that day...

I will not have a daughter-in-law. I will not have grandchildren. There will be no holidays together ever again, no laughter, no smiles, no hugs, no pranks and jokes. No conversations. A stark blatant emptiness that words cannot duly describe, and aching physical pain in my heart...
FOREVER.
My relationship with death has changed. Ask any mother ....

The dreams and aspirations of my son and of this family, what they could have been are obliterated. We are left in a war zone trying to pick up the pieces and survive. Normalcy is gone.

Since Patrick passed, I have thrown myself into finding the voice to share so that others may not have to go through this ULTIMATE LOSS. I work with THE BLACK POSTER PROJECT to raise awareness, end stigma and educate communities in the hope that other families will be able to avoid the finite outcome of death through substance, unlike me.

A piece of what I am left with today. There is no closure or resolution... The absolute is that my son was ultimately stolen at the cost of greed. On top of all of this, living with this lawsuit, having to jump through hoop after hoop after hoop to maintain a position  has been a continual wear and tear on my mental state and tipping point to emotional breakdown..   Wondering... To receive a letter in the fall of 2025 telling me that my son's life was worth $396 was a bitter pill swallow. Another few hundred dollars was added for a timely file abonus putting the total value of my son's life at $1596. My life and my family are ravaged. I sit before you today trying to pick up the pieces that did not have to be were it for not the blatant neglect and greed of this pharmaceutical family.

THOSE who walk these shoes know there are NO WORDS  to take away the  pain and suffering that we collectively have endured and will continue to do so for each DAY and lifetime involved.

Glynis J Burke

THEBLACKPOSTERPROJECT.com

Mother of deceased:

PATRICK JAMES BURKE DOLAN

4- 29-93    5-19-19

"FOREVER 26"

**018**

| | |
|---|---|
| **From:** | gia cuccaro |
| **To:** | Victimassistance Fraud (CRM) |
| **Subject:** | [EXTERNAL] Child loss due to OVER PRESCRIBING OF OPIOIDS |
| **Date:** | Tuesday, April 14, 2026 7:54:22 PM |
| **Attachments:** | ███████████████████████ |

To Whom it May Concern,

My name is Gia Cuccaro. The beloved mother of Elexis Tannenbaum who suffered a horrible back injury while working at 20 years old. My child was prescribed 120 30 MG of Oxycontin every month for 6 months if not more. This was is 2018. Once, the Doctors eventually caught on to the "addition" aspect, after being told they were non additive, and Im certain, getting kickbacks, my daughter was cut off completely. Fully addicted at this point, she turned to the streets to by said pills. After numerous years, in and out of recovery, with almost 16 months clean of all substances, she relapsed AND DIED! On Thanksgiving 2020. My world has been forever shattered. The toxicology report said there was Fentanyl in her system! Purdue Pharma is responsible! I played in bed for 2 years mourning the loss of my child. Zero income, zero support or resources. I am here today ONLY for the simple fact that MY CHILD has blessed me with 2 beautiful grandaughters. If not for them, I WOULD SURELY BE IN THE DIRT! My daughters story needs to be told PURDUE PHARMA needs to look me in the I and apologize. To ME AND MY GRANDAUGHTERS! This is a disgrace!

Sincerely,
Gia Cuccaro, Elexis's mom, forever 26







**019**

| | |
|---|---|
| **From:** | Robin D&#39;angelo |
| **To:** | Victimassistance Fraud (CRM) |
| **Subject:** | [EXTERNAL] Drug addiction |
| **Date:** | Tuesday, April 14, 2026 11:01:09 AM |
| **Attachments:** | IMG_2123.png |

I am writing to you to share my story w addiction.  My life was so good before my son Salvatore got script for a broken nose in a college basketball game. This is where my nightmare began. We sent him to recovery in fl to help him but all that did was make things worse. ( Florida shuffle) My beautiful boy can't walk anymore.  I'm raising my grandchildren and that alone is a heartache cause he so lost he can't find his way out. He moved on to fentanyl than tranq, which eats his skin when detoxing out of body . They really never recover and it devastating to us.. We are raising  our beautiful grandchildren from birth . The one thing w addition is you watch your kid kill himself slowly and there's literally nothing g we could do . We /I want jail time I have an empty seat here everyday and I want them to suffer a loss like I have . Plus ,





grieve mine .. My son is on the bench w Kobe Bryant now he's dying on the streets cause of the sacklers . Please forgive any mistakes, I cried terribly writhing  this. The life of a drug addict is something you should never have to deal w cause of greed . please read empire of pain and learn how they intentionally did this. If they were given jail time in 1997 my son would have never gotten them pills.  Please help us get justice. Please forgive any mistakes my grandchildren and my beautiful boys .

Sent from Yahoo Mail for iPhone













Here are my grandchildren that were born highly addictive and the sacklers offered peanuts for the damages their drugs done to families. They are still greedy as ever and that s what made them dangerous. They should be charged w crimes against humanity. They know . jail time please

Jim Rex Video Mail for iPhone

On Tuesday, April 15, 2026, 12:37 PM, Robin USAO <[REDACTED]> wrote:

My statement can be made public and I don t want to speak orally

Jim Rex Video Mail for iPhone

On Tuesday, April 15, 2026, 12:31 PM, Robin USAO <[REDACTED]> wrote:

It could be made public. my statement as of talking my statement can be made public ly

Jim Rex Video Mail for iPhone

On Tuesday, April 15, 2026, 12:31 PM, Victimassistance Fraud (CRM) <[REDACTED]> wrote:

Good morning,

Thank you for your email. This is to confirm that we have received your statement and will pass it along to the attorneys handling this case. The court has also determined that individuals must elect whether they want their statement to be (1) accessible only to the Court, the government, and defendant [PRIVATE], or (2) publicly accessible [PUBLIC]. Statements submitted without an election will be treated as PRIVATE. In addition, please let us know whether you are interested in being considered to make an oral statement at the sentencing hearing. Please note that individuals who desire an opportunity to provide an oral statement must submit a PUBLIC written statement and provide notice of their desire to speak by April 16, 2026. Additional information is available on our case webpage here [REDACTED].

Please respond letting us know whether you would like your statement to be public or private and whether or not you would like to be considered to make an oral statement at sentencing on April 21st.

If you have any additional questions or concerns, please let us know.

Sincerely,

Victim Witness Unit
Fraud Section, Criminal Division
United States Department of Justice

From: Robin [REDACTED]
Sent: Tuesday, April [REDACTED]
To: Victimassistance Fraud (CRM) [REDACTED]
Subject: [EXTERNAL] Drug addict

I am writing to you to share my story w sacklers . My life was so good before my son Salvatore got script for a broken nose in a college basketball game. This is where my nightmare begins. We sent him to recovery & tb to help him but all that did was made things worse. (Points stuffed) My beautiful boy can't walk anymore. I'm raising my grandchildren and that alone is a heartache cause he so lost he can't find his way out. He moved on to fentanyl then boss, which eats his skin when detoxing out of body. They really never recover and it devastating to us. We are raising our beautiful grandchildren from birth. The one thing w addition is you watch your kid slt himself slowly and there's literally nothing g we could do . We Parent jst time I have an empty seat here everyday and I want them to suffer a loss like I have . Plus ,

















I opt out of their offer of money which was an insult to parents. I opt out cause it was crumbs they threw at us while them made billions of the blood of our children . I'm asking jail time. Here are pics of my boy before and after , he can't walk no more all from a script from a greedy family . While me and my family suffer they will continue to live there life while I grieve mine .. My son is on the bench w Kobe Bryant now he's dying on the streets cause of the sacklers . Please forgive any mistakes, I cried terribly writhing this. The life of a drug addict is something you should never have to deal w cause of greed . please read empire of pain and learn how they intentionally did this. If they were given jail time in 1997 my son would have never gotten them pills. Please help us get justice. Please forgive any mistakes my grandchildren and my beautiful boys .

**020**

| | |
|---|---|
| **From:** | ████████████████ |
| **To:** | Victimassistance Fraud (CRM) |
| **Subject:** | [EXTERNAL] Impact Statement, I lost my son Because of Purdue Pharmaceutical, I would like to speak at the hearing |
| **Date:** | Sunday, April 12, 2026 10:44:48 PM |

To those responsible at Purdue Pharmaceutical,

There are no words strong enough to hold the weight of what you've done—but I will try, because my son's life deserves to be spoken about, and your choices deserve to be confronted.

My son, Anthony, was everything good in this world. He was strong, determined, and full of life—a gifted athlete with a future that was wide open in front of him. He wasn't broken. He wasn't lost. He was simply injured… and he trusted the system that was supposed to help him heal.

But instead of healing him, your lies poisoned him.

You told the world your drugs were safe. You pushed them, knowing the risks, knowing the addiction, knowing the devastation they would cause. And my son paid the price for that deception with his life.

Do you understand what that means for me, as his  mother?

It means the last time I saw him, I didn't know it would be the last.
It means I live every single day replaying moments, wishing I could go back, wishing I could save him, wishing I could take his place.
It means I wake up to a silence where his voice should be… and go to sleep with a pain that never, ever leaves.

You didn't just take my son—you took my reason for breathing.

Anthony had a child. A beautiful child who will grow up hearing stories instead of making memories. A child who will never feel his father's arms, never hear his advice, never know firsthand just how incredible of a man he was. That loss is not temporary. It is forever.

And then there is my mother… his grandmother. She loved him with a depth only a grandparent can understand. When Anthony died, something inside her broke in a way that could never be repaired. I watched her fade, consumed by grief, until her heart simply couldn't take it anymore. You didn't just take one life—you destroyed generations.

That is the legacy of your greed.

You chose profits over people. You chose money over my son's life. You chose to ignore the destruction because it was making you rich.

And now I live in the aftermath of that choice.

I live with a grief so suffocating it feels like I am drowning most days. There are moments I physically ache just to hold my son again, to hear him laugh, to see his smile walk through the door. There are days it is hard to breathe because the weight of missing him crushing.

But what breaks me the most… is not just losing him.

It's knowing the life he was supposed to have will never exist.
The milestones he will never reach.
The father he will never get to be.
The memories we will never share.

You stole all of that.

You stole my son.
You stole my family's future.
You stole a love that can never be replaced.

And no amount of money, no settlement, no apology will ever give him back.

I will grieve him for the rest of my life.

And you will never fully understand the depth of what you have taken.

I want you to be held responsible.

I want you to feel the weight of what you've done—not in numbers, not in settlements, but in the lives you destroyed and the families you shattered.

I want you to show real remorse. Not rehearsed statements. Not legal apologies. I want you to truly acknowledge that your choices took my son from me—that your greed cost him his life.

And I want you punished for what you took.

Because what you took from me cannot be measured. You took my child. You took his future. You took a piece of me that will never be whole again.

There is no consequence that could ever match this loss—but there must be accountability. There must be justice. Because without it, the pain you caused is dismissed, and the lives you destroyed are reduced to nothing more than collateral damage.

I will carry this grief forever.

You should carry the responsibility just as long.


— Because of you , I am A Mother Living a Lifetime of Loss and pain


I would like to speak at the hearing

Gina DeMaria,BS, CAAP, CFRP, CPS
 Executive Director Founder
Anthony's Way Foundation
Dominic House I,II, III,IV

██████
██████████

Cell: ████████

**024**

| | |
|---|---|
| **From:** | Linda Gibson |
| **To:** | Victimassistance Fraud (CRM) |
| **Subject:** | [EXTERNAL] Victim statement |
| **Date:** | Monday, April 13, 2026 7:01:10 PM |

I am a angel mom of a daughter who at 17 yr old was given a RX. for oxycodeine when she had multiple injuries related to an accident.

She was told as was I that she would not become addicted and we're shown literature that showed that.

She had a total of 3 refills and was then prescribed more as she went through painful rehab. She quickly became addicted trying alcohol and other pills anything she could get on the street as the doctor weaned her off.

She fought her addiction through rehab and finally after 10years succumbed to her addiction and died.

No she didn't die of the prescription that was handed to her but rather to street drugs she took to accomplish her addiction to pain killers that were suppose to be safe. I realized all drugs could cause a psychological addiction but no idea that this was so addictive she had said by the time she finished her first prescription she was addicted. What is the life of a addict and the family who loves them? Pure hell as they hooked up with people who would beat her for the money for the pills and rape her instead of helping her. She was beaten so bad that you couldnt see her eyes.

I was robbed by her supplier and she would say horrible things to me her mother due to the addiction.

Her hell ended 10 years later at the age of 27. This company should not be allowed off so easily. They killed numerous young bright children and young adults who had no idea of the potency and the addictive nature of the drugs this company supplied for profit.

I will never get my beautiful daughter back Samantha Anne is forever 27. Our family disintegrated my hopes for grandchildren, her wedding her dreams of becoming a veterinary doctor dashed.

Please dont let them get away with this. My daughter is gone.Please hold them accountable.

My daughter is on the drug epidemic wall I've attached her picture.

Please hold them to the coals of hell.

Thank you,

Linda Gibson mother

Daughter: Samantha Anne Hardy



# 025

**From:**      Janis Sparacio
**To:**        Victimassistance Fraud (CRM)
**Subject:**   [EXTERNAL] Victim Impact Statement
**Date:**      Wednesday, April 15, 2026 9:55:05 AM

Judge Madeline Cox Arleo
4/15/26
U.S. District Court for the District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07102

U.S. Department of Justice
Criminal Division, Fraud Section
10th & Constitution Avenue, NW
Bond Building, 4th Floor
Washington, DC 20530

To the Honorable Madeline Cox Arleo and the United States Attorney's Office:

My name is Janis Granger-Sparacio and my son, Harris, died in 2019, at the age of 25. He died as a result of the typical trajectory that an addiction to opioids leads to, an overdose.

Harris was a strong, 6'1, athlete.  He fought this battle for 6 years, going to detox 19 times and attending countless rehabs all over the country.  Harris was a very handsome American boy from New Jersey. Charismatic, funny, a leader. And so much more. This addiction tortured him, and his family, and he could not escape it.  This is exactly what was intended by Purdue. The pills that my son, and his friends, (all lacrosse players at the time) ingested, had a doctor's name on the bottle.  They could not have known that these pills would forever change their brain chemistry. No one knew, except the people who purposely pushed it, Purdue.

The havoc that this addiction unleashed on us was unbearable. His death has nearly destroyed my family and our extreme sorrow is inescapable and forever.

I did not save all of the documentation that seems to be required to sue the Sackler family myself. We lost much of our savings trying to save him, as did many other families.

It is inconceivable to most people that Purdue would not be held properly accountable for trauma that they inflicted and the death of millions. They should not be billionaires that go on with their lives. That money is truly blood money. The settlement money should not go to lawyers and states while grieving families have no representation.

Please honor these deaths by letting the country know that the justice system will fight for what is right and send a message that will set future precedents.  I am willing to speak if necessary.

In honor of Harris G. Sparacio.

Sincerely,

Janis Granger-Sparacio

**026**

*UNITED STATES v.* __Purdue Pharma L.P.__

**COURT DOCKET NUMBER:** __2:20-cr-01028-MCA__

VICTIM NAME: __Donnie Harris__

**Please select one of the following as it relates to your statement that follows:**

☐ I want my statement to be PRIVATE (only accessible to the court, the government, and the defendant)

☑ I want my statement to be PUBLIC (made publicly available on the court docket)

**I would like to be <u>considered</u> to provide an oral statement at the sentencing hearing on April 21, 2026:**

☑ Yes

☐ No

> ➢ Please note the court has advised that anyone who wishes to make an oral statement <u>must</u> elect to have their statement made public. In addition, the court has determined that it will allow a limited number of individuals to speak at the sentencing hearing. If you are selected to provide an oral statement, you will be informed in advance.

**Victim Impact Responses**

P.1

**How have you and members of your family been affected by this crime? Feel free to discuss how the crime has affected you and/or your family's health and lifestyle.**

My name is Donnie, and I am here to speak about how Purdue Pharma's actions changed the course of my life and the lives of my family. I did not begin this journey looking for addiction. I was a husband, a father, and a working man dealing with pain. I trusted my doctor, and my doctor trusted the information he was given. When Purdue released the new, non-crushable OxyContin, they acted like it was safer. The only warning on the bottle was 'Do Not Crush.' But the real danger wasn't crushing — it was taking it exactly as prescribed. The warning should have told patients the truth: that this medication carried a high risk of dependence, withdrawal, and life-altering harm. Instead, people like me were left unprotected. Prescription opioid addiction does not begin with reckless choices. It begins the same way caffeine, tobacco, or alcohol begin — slowly, quietly, and under the illusion that you are in control. At first, I took the medication exactly as prescribed. But as the drug took hold of my body, my mind began telling me, "You need more." I started running out early. My doctor increased the strength, increased the quantity, and increased the dose. And all around his office were notepads, calendars, and materials advertising stronger and stronger opioids. Pharmaceutical representatives brought food, gifts, and samples. The system was designed to push more pills, not protect patients. Over the years, my prescriptions escalated to levels that shock people when they hear them. I was taking OxyContin 60 mg twice a day, oxycodone 10 mg four times a day, multiple muscle relaxers, and sometimes benzodiazepines mixed in. I have no idea how many times I almost died in my sleep. People today, when they hear what I was taking, they tell me I'm lucky to be alive. After nearly a decade, I reached a point where I told my doctor, "I can't do this anymore. I'm going to die — either from the medication or from the withdrawals." My doctor admitted he had no training in opioid dependence. He didn't know what to do except refill my prescription early. That was the level of support available to someone trapped by a drug Purdue insisted was safe. I eventually learned about Suboxone and begged for help. The transition was agony — cold sweats, shaking, nausea, pain so severe I ended up in the emergency room. The ER told me I had two choices: endure the withdrawal or go back to opioids. I chose to fight for my life, for my wife, and for my two sons. The financial cost of this has been devastating as well. For years, I paid enormous amounts of money for OxyContin — hundreds of dollars a month — because I was filling prescriptions early and at higher and higher doses. Pharmacies filled them but insurance refused to pay for them, so I paid out of pocket because my body was dependent on a drug I never fully understood. And the cost didn't end when I got off OxyContin. For the last fourteen years, I have had to pay for Suboxone every single month just to function. Even with rebates, I have spent thousands and thousands of dollars trying to stay

alive and stable. This is not a temporary expense — it has become a lifelong financial burden created by a medication that was marketed as safe. Fourteen years later, I still depend on Suboxone because my body cannot function without it. When I try to stop, my blood pressure and heart rate become dangerous, and the pain becomes unbearable. Where were the warnings? Where were the cautions? Where was the training for the doctors who were prescribing these drugs? Today, doctors, nurses, and hospitals look at me as if I am the problem — as if I chose this. I am treated like a drug seeker, like someone who cannot control himself, when the truth is that I was placed on a path I never asked for and never understood. This crisis did not just affect me. It affected my wife, who lived with fear every night that I might not wake up. For years she would startle me awake, shaking me again and again, night after night, yelling wake up, you stopped breathing. It affected my sons, who watched their father struggle through pain, withdrawal, and survival. It affected my entire family, who had to live with the consequences of a drug that was marketed as safe but was anything but. I also think about the people who didn't survive. One middle-aged woman, whose doctor abruptly stopped prescribing for her, became so desperate that she walked into a 24-hour pharmacy with a sawed-off shotgun and demanded all of their opioid medications. She didn't even make it out the front doors. That's the level of desperation this drug created. That is the level of harm Purdue's actions caused. Your Honor, This is not a part of my life I enjoy talking about. In fact, I am ashamed of it, and for years I've been silent because of that shame. But I have come to believe that someone needs to speak out — especially someone who lived through this and survived. I am not here for money, and I am not here for attention. I am here because I have taken the medication Purdue Pharma made, and I know what it did to me. I also know that thousands of others lived the same story, and many of them are no longer alive to speak for themselves. I feel a responsibility to tell the truth on their behalf. We live in a world where everything carries a warning. Dynamite has warnings. Cigarettes have warnings. Even a cup of hot coffee has warnings. Yet the drug that has harmed and killed thousands of people — a drug that was marketed as safe and non-addictive — carried no real warning at all. There was no caution, no education, no training for the doctors who prescribed it, and no protection for the patients who trusted them. There needs to be accountability for the enablers who allowed this to happen. Your Honor, I am not here out of anger. I am here because the truth matters. Purdue Pharma's decisions — the marketing, the misrepresentations, the pressure on doctors, the lack of warnings — created the conditions that led to my dependence, my suffering, and the lifelong stigma I now carry. Your Honor, I want to close with something that has weighed heavily on me for years. When a person on the street sells an illegal opioid to someone struggling with addiction, and that person dies, the dealer is charged with homicide. Society recognizes that supplying a dangerous drug to a vulnerable person carries responsibility. I ask the Court to consider how different this situation truly is. Purdue Pharma manufactured and promoted a drug that caused addiction, dependence, and death on a scale far beyond anything seen on the street. Yet the people who trusted their doctors and took these medications exactly as prescribed were the ones who paid the price. I believe accountability should apply at every level, especially to those who created and profited from the danger.

p. 2

**Have you and/or members of your family received counseling as a result of this crime?**

Yes, when I took myself off of OxyContin and was labeled an addict it was part of the requirement in order to be prescribed Suboxone.

p. 3

**If you and/or a family member were a patient of the defendant, did you and/or the family member express any concerns to the defendant in relation to the charged conduct?**

No. I never had any direct contact with Purdue Pharma, and I had no way to express concerns to them. My concerns were expressed to my doctor — the person I trusted — when I told him I was running out early, that I felt something was wrong, and that I was afraid of how dependent I had become. But my doctor did not warn me, did not taper me, and did not offer alternatives. He simply increased the dose or refilled the prescription early. At the time, neither he nor I understood the danger because the information he relied on came from Purdue's marketing and materials. So while I did express concerns, they never reached the defendant, and the system Purdue created prevented me from getting the truth or the help I needed.

**Do you believe the defendant began or contributed to you and/or your family member's addiction?**

Yes. Purdue Pharma directly contributed to the beginning and progression of my addiction. I took OxyContin exactly as it was prescribed to me, trusting the information my doctor had been given — information that came from Purdue. The company marketed OxyContin as safe, effective, and low-risk, while minimizing or denying the true danger of dependence. Their misrepresentations shaped how doctors prescribed it and how patients like me understood it. I did not choose addiction; I was placed on a medication that was far more addictive than anyone told me, and Purdue's actions played a central role in that.

**Did the defendant prescribe or dispense drugs that resulted in death or bodily injury?**

No. Purdue Pharma did not personally prescribe or dispense my medication, but the drugs they manufactured and aggressively promoted — specifically OxyContin — caused me significant bodily injury. I took OxyContin exactly as it was prescribed to me by my doctor, who relied on Purdue's marketing and claims about safety and

low addiction risk. As a result, I developed a severe opioid dependence, experienced dangerous withdrawals, long-term health complications, and now require lifelong Suboxone treatment to function. The harm I suffered came directly from the drug Purdue created and the misinformation they spread about it.

p. 4

**Do you believe the defendant failed to provide necessary care?**

Yes. I believe Purdue Pharma failed to provide the necessary care, warnings, and protections that any responsible drug manufacturer should have provided. As a patient taking OxyContin exactly as prescribed, I was never warned about the true risks of dependence, withdrawal, or long-term harm. My doctor was not trained, educated, or properly informed about the dangers either, because Purdue minimized and misrepresented those risks in their marketing and materials.

**Did the defendant bill you and/or your family member's health insurance for unnecessary procedures or procedures that were never performed?**

No. Purdue Pharma did not bill my health insurance directly, because they are a drug manufacturer and not a medical provider. However, the medications they produced and misrepresented led to years of medical costs, early refills, emergency care, and long-term Suboxone treatment that I have had to pay for. While they did not submit insurance claims themselves, their actions created the medical circumstances that resulted in significant and ongoing financial harm to me.

**Have you experienced any of the following reactions to the crime:**
**Anger,  Anxiety, Fear,  Grief,  Guilt,  Chronic Fatigue,  Sleep Loss,  Addiction,  Appetite Change,**
**Sickness,  Trouble Concentrating,  Financial Stress,  Depression:**

 I have experienced all of these symptoms. Some have passed, but most I still carry.

**Please describe any other reactions to the crime committed.**

My wife of 42 years, my two sons as they went through high school.  Everyone in my family has suffered many of the same things I went through.. This has affected my entire family and not just me.

p. 5

**Do you feel the defendant is or will be a threat to you, your family, or the community?**

Yes. I believe Purdue Pharma's past actions and the systems they created continue to pose a threat to the community. While the company is no longer operating in the same way, the harm they caused did not end when the pills stopped being sold. Their misleading marketing, lack of warnings, and failure to acknowledge the true risks of addiction created a nationwide crisis that still affects families, including mine, to this day.

**What else would you like the Court to know about the defendant or your situation as a result of the crime?**

I want the Court to understand that what happened to me was not the result of bad choices or reckless behavior. I took OxyContin exactly as it was prescribed to me, trusting my doctor, who trusted the information he had been given. Purdue Pharma created a system where neither patients nor doctors were given the truth. The harm I suffered was not an accident — it was the predictable outcome of a drug that was far more addictive and dangerous than the company admitted.

**If a victim consents, the Court may also make restitution in services in lieu of money, or make restitution to a person or organization designated by a victim. If you are interested in this option, please explain.**

Your Honor, if restitution in the form of services is considered, I would want those services directed toward better education for doctors, nurses, and medical staff about opioid dependence and long-term treatment. I want the medical community to understand that patients like me,  people who took OxyContin exactly as prescribed, are not the problem. Yes, I became addicted because of this medication, but taking Suboxone today does not make me an addict. I have been on the exact same stable dose for fourteen years with no misuse, no cravings, no mood swings, no waiting for early refills, no cold sweats, and yet I'm still called an addict by health care professionals today.. Suboxone is a treatment, not a sign of addiction. If restitution can help improve medical education so that patients like me are treated with respect instead of stigma, then I would support that fully.

p. 6

**Please list your actual financial losses from this crime. List only those items for which you have not been or do not expect to be repaid. Please attach receipts or other records that document your losses whenever possible. Please differentiate any monies already repaid by a defendant.**

OxyContin:.................................................................................................................... $6,000

Doctor's visits just for OxyContin Prescriptions: ……………………………………..$840

Work missed, Ran out of OxyContin early and can't work………………………………$$$$

As an automotive technician I was paid by the job, days I could barely work…………..$$$$

ER visit for OxyContin withdrawal symptoms: ………………………………….....$400

Doctor's visits for Suboxone for the first year:.................................................................$840

Lab work to check for Opioids (Required for Suboxone use)........................................$480

Suboxone, no generic form………………………………………………………….$4,200

Second Year Different Suboxone Doctor…………………………………………..$900

Lab work………………………………………………………………………....$480

Suboxone………………………………………………………………………… $4,200

Even though I was the one wanting to get off OxyContin I was still required to take a monthly drug test to see if I was "Using" again.  I even had staff at lab clinics ask me if they were going to find Opioids in my system.  All of this I have to pay for because I'm an addict, it's my fault.

Continued doctors visits for Suboxone prescriptions monthly 14 years……………… $14,616

Labs…………………………………………………………………………… $4,200

Suboxone………………………………………………………………………… $58,800

I have not been able to work since March of 2021 from complications of OxyContin. I am on Medicaid and they only cover 14 days of Suboxone if you use their doctor.

**Have you been assessed any additional taxes, penalties, or interest by the federal government as a result of this case? If yes, please explain:**

No. I have not been assessed any additional taxes, penalties, or interest by the federal government as a result of this case.

**Have you or anyone on your behalf initiated civil action against any party as a result of this offense? If yes, please state the case name, docket number and court of jurisdiction.**

P.6 cont.

Yes. I initiated civil action as a pro se claimant in the Purdue Pharma bankruptcy proceedings. My claim was filed under Case No. 19-23649 in the United States Bankruptcy Court for the Southern District of New York. My individual Proof of Claim number is 128700.

**If you have suffered any other expenses as a result of this crime, please list them below. Include such items as counseling, medical bills, lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. Please be specific and attach copies of receipts if possible.**

Yes. I have suffered significant expenses as a direct result of Purdue Pharma's actions and the addiction that followed. These include: Out-of-pocket costs for OxyContin, including early refills and higher doses that insurance refused to cover. Fourteen years of Suboxone treatment, paid monthly, which has cost thousands of dollars over time. Medical bills related to withdrawal, complications, and long-term health issues caused by opioid dependence. Emergency room visits during severe withdrawal episodes and medical crises. Lost income, due to the physical and emotional impact of addiction, recovery, and long-term treatment. Transportation costs for medical appointments, counseling, and treatment-related visits. Counseling and mental-health-related expenses, including support needed to cope with the trauma, stigma, and long-term effects of addiction. Additional medical expenses related to complications that developed during and after opioid dependence. These costs have accumulated over many years and continue today because I require ongoing Suboxone treatment to function normally. Many of my records  and receipts are filed with my claim under Case No. 19-23649 in the United States Bankruptcy Court for the Southern District of New York. My individual Proof of Claim number is 128700.

Donnie O. Harris



Email:

**027**

*UNITED STATES v.* **Purdue Pharma L.P.**

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: _Oletha Helms_

**Please select one of the following as it relates to your statement that follows:**

☐ I want my statement to be PRIVATE (only accessible to the court, the government, and the defendant)

☒ I want my statement to be PUBLIC (made publicly available on the court docket)

**I would like to be <u>considered</u> to provide an oral statement at the sentencing hearing on April 21, 2026:**

☒ Yes

☐ No

> ➤ Please note the court has advised that anyone who wishes to make an oral statement <u>must</u> elect to have their statement made public. In addition, the court has determined that it will allow a limited number of individuals to speak at the sentencing hearing. If you are selected to provide an oral statement, you will be informed in advance.

## UNITED STATES v. PURDUE PHARMA L.P.

### COURT DOCKET NUMBER: 2:20-cr-01028-MCA

VICTIM NAME: OLETTA HELMS

### VICTIM IMPACT STATEMENT

*Completing this form is optional and the questions serve as a guide for potential issues that you and/or your family may have encountered as a result of the offense. Please feel free to draft a letter or submit a Victim Impact statement another way instead of using this form.*

How have you and members of your family been affected by this crime? Feel free to discuss how the crime has affected you and/or your family's health and lifestyle.

Purdue Pharma changed my life. There are many life-changing moments, the birth of a child, the wedding day, the day you graduate school. Purdue Pharma's drugs taking the life of my son, Russell, was one of my life changing moments.

Every time Russell and I went into the Doctor's office there stood the Perdue Pharma salesmen, targeting us, and marketing their drugs to us. Russell and I then became addicted to Purdue Pharmas drugs. I suffered a massive heart attack. Russell was not so fortunate. On January 19, 2005 Russell took opioids like he so often did, and that night I held him in my arms as he languished, drifted away, and died. This is a moment I will never forget. My life has been forever changed for the worst thanks to Purdue Pharma.

We always hope to make the world a better place in life. Purdue Pharma made the world a worse place. Not just mine, they destroyed the lives of millions. An abomination.

Have you and/or members of your family received counseling as a result of this crime?

X Yes ___ No

If yes, please explain: Both my son and I each went through extensive grief counseling.

*UNITED STATES v. PERDUE PHARMA L.P.*

**COURT DOCKET NUMBER: 2:20-cr-01028-MCA**

VICTIM NAME: OLETTA HELMS

**VICTIM IMPACT STATEMENT**

If you and/or a family member were a patient of the defendant, did you and/or the family member express any concerns to the defendant in relation to the charged conduct?

_____ Yes  X No

If yes, please explain:

Do you believe the defendant began or contributed to you and/or your family member's addiction?

X Yes ___No

If yes, please explain:

The salesmen were always in the Doctors office recomneding their meds when we visited. The doctor acted as though he was best friends with the salesmen.

Did the defendant prescribe or dispense drugs that resulted in death or bodily injury?

X Yes ___No

If yes, please explain: I lost my son Russell Helms to an overdose of Purdue Pharma's drugs. It affected my life and my other son's life. I stopped caring about life; I also suffered a massive heart attack.

*UNITED STATES v. PURDUE PHARMA L.P.*

**COURT DOCKET NUMBER:2:20-cr-01028-MCA**

VICTIM NAME: OLETTA HELMS

**VICTIM IMPACT STATEMENT**

Do you believe the defendant failed to provide necessary care?

X Yes ___No

If yes, please explain:

They should have provided mitigation of their harms and done something to stop their harms when they realized the drugs were highly additive.

Did the defendant bill you and/or your family member's health insurance for unnecessary procedures or procedures that were never performed?

___ Yes  X No

If yes, please explain:

Have you experienced any of the following reactions to the crime:

X Anger  X Anxiety  X Fear  X Grief  X Guilt  X Chronic Fatigue  X Sleep Loss
X Addiction ___Appetite Change  X Sickness  X Trouble Concentrating  X Financial Stress
X Depression

Please describe any other reactions to the crime committed.

*UNITED STATES v. PERDUE PHARMA L.P.*

**COURT DOCKET NUMBER:2:20-cr-01028-MCA**

VICTIM NAME: OLETTA HELMS

**VICTIM IMPACT STATEMENT**

Do you feel the defendant is or will be a threat to you, your family, or the community?

___Yes  X No,

If yes, please explain:

Not personally threatened, but we've seen what they're capable of.

What else would you like the Court to know about the defendant or your situation as a result of the crime?

My aspirations in life were taken from me because of the Defendant's crime.

If a victim consents, the Court may also make restitution in services in lieu of money, or make restitution to a person or organization designated by a victim. If you are interested in this option, please explain.

We desire money. No amount of money can make up for Russell's death. No amount of money can make me feel whole again. But the best the law can do is monetary compensation. It's the least that can be done to try to make me whole again.

*UNITED STATES v. PERDUE PHARMA L.P.*

**COURT DOCKET NUMBER: 2:20-cr-01028-MCA**

VICTIM NAME: OLETTA HELMS

**VICTIM IMPACT STATEMENT**

Please list your actual financial losses from this crime. List only those items for which you have not been or do not expect to be repaid. Please attach receipts or other records that document your losses whenever possible. Please differentiate any monies already repaid by a defendant.

$10,000 Funeral costs & $500 court costs

Have you been assessed any additional taxes, penalties, or interest by the federal government as a result of this case? If yes, please explain. N/A

Have you or anyone on your behalf initiated civil action against any party as a result of this offense? If yes, please state the case name, docket number and court of jurisdiction.

No, other than this pending class action bankruptcy case.

If you have suffered any other expenses as a result of this crime, please list them below. Include such items as counseling, medical bills, lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. Please be specific and attach copies of receipts if possible.

$1,000 transportation and moving

**029**

**Victim Impact Statement: (PUBLIC and open to presenting virtually on April 21st)**

From Barbara Huculak, on behalf of on behalf of DECEASED husband, Dennis Huculak and daughter, Jordan Haley Huculak

**Case of United States vs Purdue Pharma L.P.**

Court docket: 2:20-cr-01028-MCA

Statement:

On this last April 12th, 2026, it has been 23 years that I have been doing what I can to honour my lost husband and daughter who died in a collision that night in 2003.  One way I do this is to open myself to the pain of telling our story when it may help to hold the correct parties accountable for their deaths and for the excruciating pain and suffering that Dennis suffered. He was living with a congenital hole in his heart which had become symptomatic in about 1997, but was only being treated for the pain by his 'physician' of about 5 ½ years.  He also lived with the pain of addiction, and of sudden withdrawal on occasions when we had no money to pay for another fill.

The collision report says that my husband did not put on the brakes at all, as he collided at full speed into the back of a semi that was slowing on the highway. It is thought that, due to the amount of Oxycontin in his blood, that he didn't notice the truck. It is also likely that he could not lift his foot fast enough to hit the brake.

Since around 1997, my husband had been seeking help for the growing pain due to blood pooling in his thickening legs, blackened skin like an alligator's, cracked with fluids leaking from them.  I have attached a photo that will shock you, especially noting that his doctor decided painkillers were his only treatment.  Over a short time, the condition worsened such that he avoided sitting or laying down, as to stand again brought even more unbearable pain.  Over the last year of his life, he mostly slept hunched over a counter, with a bottle beside him to urinate in, should he not be able to move fast enough.

Over those years, his only treatment provided by his doctor, ▮▮▮▮▮▮ (the named Addictions Specialist in the ▮▮▮▮▮▮▮▮▮▮▮▮ at the time), was painkillers. He quickly moved Dennis onto Oxycontin, despite knowing Dennis had been previously addicted to Percocet, with that drug not being adequate to reduce his pain.  While I was vocal with the doctor about needing a cardiologist, it was refused until Dennis collapsed in atrial fibrillation on his birthday, in January of 2003.  It was at the hospital that the medical team began to oversee the lack of treatment Dennis was receiving due to the never ending and increasing prescription of Oxycontin as his ONLY treatment.  They could not fathom the amount of drugs being prescribed to him. 80 mg pills, 40 per day, corroborated by the pharmacy reports provided in our claim.

The doctor alone can answer why he did nothing else to help Dennis, but I can guess why.  I saw his clinic waiting room full of people sitting for hours until this doctor emerged from drug presentations/ lunches, etc behind the scenes, to begin giving out the triplicate prescriptions they

were all there waiting for.  It is my opinion that the doctor had an addiction of his own; his was to the financial gains and perks he was enjoying due to the highly addictive narcotic he was handing out in toxic levels. He was sitting on a 'cash cow' and, further, he had a 'get out of jail free card' with the false claim made by Purdue that this drug was not addictive.   This doctor, like any of us exposed to it, had to know very well that Oxycontin was not only highly addictive but that it created the depth of addiction that turns one into a monster, needing more, giving up anything to get it.

Our family was financially devastated by the costs that grew and grew.. over $2,000 a fill with a minimum two fills per month. How could he take so much of this powerful drug? I believe it was because my husband had been born to a heroin addicted mother. He was born with tolerance. Once taken away from that mother, the tragedy did not end. Once the heart stopped pumping correctly and his legs became elephant sized, his tragic life took another turn.

Our life as a family centered around the drugs. There were never ending trips to the doctor and running low on his pills meant our plans were on hold while he got more. We did not have enough money to pay for these drugs and our bills. We struggled to buy groceries, pay the mortgage or manage to find $4 for pizza lunch day for the kids in elementary school.  As noted, he stopped paying for life and car insurance.  Our young children were in the car the night we were pulled over on New Years Eve in 2001, with Dennis arrested on an outstanding warrant for something he had done in the name of getting drugs.  My mom had to go bail him out.  We lived in shame. I had to hide our family's secret from the outside world, and Dennis' adopted family decided to cut us out of their lives, shunning us as Dennis' name was announced on the news one night, embarrassing them. Rather than help us, they told me to leave him.

Dennis and I had run our own consulting firm for years, but as his illness and the addiction grew worse, he was physically incapable of walking without great pain, without causing client's wondering what was wrong.  We lost work. He got jobs to keep us surviving, but was fired from all until the last one that he still held when he died.  As his wife, dealing with the lies he told trying to keep me from finding out he had totalled our leased truck or took the money out of the kid's bank accounts, was horrendous.  I understand and forgive him now.

Dennis stopped trying to get real treatment, as long as he got his drugs. It was me who lost my mind with ████████ at the lack of medical care and he wrote me up stereotypically in Den's medical file as 'hysterical'.   I remember our hopelessness and our desperation, but I try not to go back in my mind to that awful feeling. Despite Den's suffering and my utter hopelessness, we both tried to keep our young daughter's lives as 'normal' as we could. I will never know how Dennis summoned the determination to crouch down on the ground to play with them at times, to do 'the claw' like Jim Carrey in Liar Liar, and have them squeal with laughter.   I know it destroyed him inside not to be able to be the Dad he was before the condition and drugs took over.

My oldest girl, Jordan, was devastated to be cut off from the side of the family that shunned us, cried at being excluded from family Christmas. She read medical texts I had in the house, trying to diagnose her Dad's condition.  She became so empathetic to health issues that by time of her death

she had proclaimed her desire to become a doctor to cure leukemia.  Her upset for her Dad's struggle to walk was visible, just way too much for a 9 year old girl to have to handle inside.

And so, on the night of April 12, 2003, when she wanted to go with her Daddy to pick up ice cream from Dairy Queen, I let her go.    I cannot forgive myself fully for letting her go in the truck with him alone, but I know why. I was exhausted and wanted her to feel normal, wanted Dennis to feel like he was normal.  A kid should be able to go to DQ with their Dad.  So she left with him and by about an hour later, after calling his cell to no answer, I knew we had to go looking for them.

Jordan was 9 and ¾ years old. Dennis was 40 We found them in a collision on the side of the highway. Dennis was dead, Jordan appeared so but was being lifted to the hospital by air ambulance.  Neurologists surrounded me in a room there, telling me there was no hope for her.  I had to personally direct them to pull the plug on her respirator, and I helped the nurse wash her body. I am told that was something that makes a grieving parent feel better.   I cannot say that it did then, but I remember it now as my last loving act for my daughter.

My younger daughter, Sydney, was just about to turn 7; her birthday was the next week. Our friends surrounded us and put a gathering together for her.   Imagine the impact of just this one night's experience on a child so young, yet alone comprehending the loss of half of her family in one night.

I was denied Dennis' life insurance because he had lied on his renewed life insurance application after he had been delinquent on the premiums for our first policy.   He died leaving me a mortgage with no insurance on it, no life insurance, bills and credit collectors, another truck written off, and there was no auto insurance on it; he had not paid that either.

I got a job and began to try to survive one day at a time.  My daughter, Sydney and I are tough as hell but I personally have never stopped trying to get justice for my poor Jordan and for Dennis.  I tell their story to honour their needless suffering and death.

I have lived with the lies of a person severely drug addicted and in fear of the pain that would come without his drugs.  These lies are understandable.   The lies of the Sacklers and Purdue, denying the addictive quality of Oxycontin, were for greed.  The acts of Dennis's doctor, also for greed. No amount of punishment can return our family, but holding the greedy liars accountable will help my heart get some peace.

*UNITED STATES v.* **Purdue Pharma L.P.**

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Barbara Huculak (for deceased husband Dennis Huculak and daughter Jordan Huculak)

**Please select one of the following as it relates to your statement that follows:**

☐ I want my statement to be PRIVATE (only accessible to the court, the government, and the defendant)

☑ I want my statement to be PUBLIC (made publicly available on the court docket)

**I would like to be <u>considered</u> to provide an oral statement at the sentencing hearing on April 21, 2026:**

☑ Yes

☐ No

➢ Please note the court has advised that anyone who wishes to make an oral statement <u>must</u> elect to have their statement made public. In addition, the court has determined that it will allow a limited number of individuals to speak at the sentencing hearing. If you are selected to provide an oral statement, you will be informed in advance.

*UNITED STATES v.* Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Barbara Huculak (for deceased husband Dennis Huculak and daughter Jordan Huculak)

## VICTIM IMPACT STATEMENT

*Completing this form is optional and the questions serve as a guide for potential issues that you and/or your family may have encountered as a result of the offense. Please feel free to draft a letter or submit a Victim Impact statement another way instead of using this form.*

How have you and members of your family been affected by this crime? Feel free to discuss how the crime has affected you and/or your family's health and lifestyle.

I have attached a document in lieu of filling out this text box; see email of April 14 holding the attachment.

Have you and/or members of your family received counseling as a result of this crime?

☑ Yes  ☐ No

If yes, please explain:

In 2003, both my surviving daughter, age 7, and myself saw free counsellors provided by govt. as we had no resources. Again in approx 2019, we both realized we were suffering PTSD and nervous system dysregulation due to the tragic loss of Dennis and Jordan.

UNITED STATES v. **Purdue Pharma L.P.**

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Barbara Huculak (for deceased husband Dennis Huculak and daughter Jordan Huculak)

## VICTIM IMPACT STATEMENT

If you and/or a family member were a patient of the defendant, did you and/or the family member express any concerns to the defendant in relation to the charged conduct?

■ Yes ☐ No

If yes, please explain:

The addictive nature of Oxycontin and the physician's lack of effort to treat the medical condition while continuously focusing on prescribing Oxycontin well beyond a dosage considered survivable was approached by myself and questioned by health authorities, but i was written up in files as 'hysterical' and ignored.

Do you believe the defendant began or contributed to you and/or your family member's addiction?

■ Yes ☐ No

If yes, please explain:

If Oxycontin had been truthfully noted as highly addictive, the physician would not have felt so at ease doling it out so easily, without concern for what was obviously growing addiction and tolerance.

Did the defendant prescribe or dispense drugs that resulted in death or bodily injury?

■ Yes ☐ No

If yes, please explain:

Yes, the dosage prescribed to Dennis was not one that other doctors, cardiologist could believe was one that any human could take. Additionally, it was prescribed to a person known to have a hole in his heart.

UNITED STATES v. **Purdue Pharma L.P.**

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Barbara Huculak (for deceased husband Dennis Huculak and daughter Jordan Huculak)

## VICTIM IMPACT STATEMENT

Do you believe the defendant failed to provide necessary care?

■ Yes   ☐ No

If yes, please explain:

Addiction behavior and tolerance did not bring any action to stop it from getting worse. NO other treatment of value provided.

Did the defendant bill you and/or your family member's health insurance for unnecessary procedures or procedures that were never performed?

☐ Yes   ■ No

If yes, please explain:

Have you experienced any of the following reactions to the crime:

■ Anger   ■ Anxiety   ■ Fear   ■ Grief   ■ Guilt   ■ Chronic Fatigue

■ Sleep Loss   ☐ Addiction   ■ Appetite Change   ☐ Sickness

■ Trouble Concentrating   ■ Financial Stress   ■ Depression

Please describe any other reactions to the crime committed.

PTSD, nervous system dysregulation to this day, 23 years later, continous hypervigilance, fight or flight state.

UNITED STATES v. **Purdue Pharma L.P.**

COURT DOCKET NUMBER: 2:20-cr-01028-MCA

VICTIM NAME: Barbara Huculak (for deceased husband Dennis Huculak and daughter Jordan Huculak)

## VICTIM IMPACT STATEMENT

Do you feel the defendant is or will be a threat to you, your family, or the community?

☐ Yes   ☒ No,

If yes, please explain:

What else would you like the Court to know about the defendant or your situation as a result of the crime?

A family was decimated. My mother, Jordan's Nana, had heartache until the day she had a massive heart attack and died, jsut two days prior to the April 12th anniversary of Jordan's death. My surviving daughter and I were robbed of our family.

If a victim consents, the Court may also make restitution in services in lieu of money, or make restitution to a person or organization designated by a victim. If you are interested in this option, please explain.

Any such funds should be directed toward opioid recovery programs.

The Purdue/Sackler org has put a plague upon society with the opioid addiction they unleashed and this, in turn, brought on worse and more deadly addictions and crimes.

*UNITED STATES v.* Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Barbara Huculak (for deceased husband Dennis Huculak and daughter Jordan Huculak)

## VICTIM IMPACT STATEMENT

Please list your actual financial losses from this crime. List only those items for which you have not been or do not expect to be repaid. Please attach receipts or other records that document your losses whenever possible. Please differentiate any monies already repaid by a defendant.

I cannot estimat the losses in earnings of income by my husband over the last 20 years. The cost of Oxycontin fills at the level he was prescribed were over $50,000 per year, for about 5.5 years, so well over $250,000.

Have you been assessed any additional taxes, penalties, or interest by the federal government as a result of this case? If yes, please explain.

I was, in 2003, as my husband had taken draws from our business to buy oxycontin, and the accountant stated that as income splitting, so i had a huge tax bill and penalties for money i never received.

Have you or anyone on your behalf initiated civil action against any party as a result of this offense? If yes, please state the case name, docket number and court of jurisdiction.

I tried to sue the physician and to make a complaint against him via the College of Physicians and Surgeons.  A civil suit against a doctor is very expensive, so with no money at all, i had to withdraw.  The College avoided action against the doctor, named as the provincial medical association's Addiction Specialist, a claim on behalf of a dead addict did not get their

If you have suffered any other expenses as a result of this crime, please list them below. Include such items as counseling, medical bills, lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. Please be specific and attach copies of receipts if possible.

Now 23 years later, I am just wanting my daughter and husband's story to be heard so their deaths were not in vain.

**032**

**My name is Cheryl Juaire.**

I am angry that both of my sons died of an opioid overdose. Corey at the age of 23. Sean at the age of 42. Over the years they both had taken countless pills manufactured by Purdue.

I am angry that both of my sons never had a chance to live their lives to the fullest. They had parents and another brother and families who loved them fiercely. They were good people, they had futures, and all of that was taken from them after years and years of suffering. Their lives – and mine - should have been different.

I am angry that for many years I was embarrassed to speak about what happened to my first son, because of the propaganda that Purdue put out that oxycontin was not addictive while they and the Sacklers made billions of dollars, knowing very well that it was.

I am angry that when I realized I was not alone, and began advocating for victims, that our federal and state governments were slow to respond.

I am angry that when I marched on Purdue's headquarters in 2018, I was denied a requested meeting with CEO Craig Landau-and was turned away.

I am angry that the federal government not only knew what Purdue was doing, but helped them do it, and collected $4 billion in taxes from Purdue.

I am angry that not a penny of those tax dollars was given to victims.

I am angry that in 2019, when I was appointed to the official committee of unsecured creditors, that CVS – who also has paid billions for their role in the opioid crisis – was put on the committee by the United States Trustee – an arm of the federal government.

I am angry that although 50 individual victims showed up to be on the committee that day, the federal government put only four – a minority!!!! –on the committee.

I am angry that when the UCC advocated for a $200 million Emergency Relief Fund to be set up in 2019, to provide money to the boots on the ground support organizations, and was supported by Purdue, the State Attorneys General and the municipality lawyers fought back and ultimately killed it.

I am angry that when negotiations began about how to distribute Purdue's money, the states and the federal government looked at victims as addicts, underserving of any money.

I am angry that when I finally was in a room with Craig Landau – still Purdue's CEO – he wouldn't even look at me much less speak to me.

I am angry that 9 states would not agree to the first plan in 2021 based on what they claimed was a "principle", but when they got extra money for their states at the expense of other states and with no extra money going to victims, they changed their mind.

I am angry that the federal government appealed the plan all the way to the Supreme Court –As a result, victims have been left without compensation for close to seven years.

I am angry that when the plan was re-drawn, Purdue didn't push to give more money to victims.

I am angry that the States – who have already received close to $50 billion in opioid settlements– have given none of that money to victims, couldn't agree to take less here also.  I have learned from this case that what matters to many attorneys general is what they can brag about in their press releases to advance their political careers.

I am angry that the professionals in Purdue's bankruptcy case have been paid close to a billion dollars over seven years and victims to date have received exactly nothing.

I am angry that not one Sackler and not one Purdue executive is sitting in jail .

I am angry because long after this case is finally over, and long after the Sacklers think they're "done" with Purdue after paying off this settlement in 15 years, individual victims and their families and friends will still endure the repercussions of their evil acts.

**But I am also hopeful.**

I am hopeful that my story will be told over and over again, as I believe those that do not learn from the past are condemned to repeat it.

I am hopeful that the organization I have founded – Team Sharing – will continue to serve families who have been harmed by Purdue.

I am hopeful that every time someone contacts me that I can help them in any way I can.

I am hopeful that some, if not all, state attorneys general will decide to dedicate substantial portions of their 50 billion dollars to compensate victims.

I am hopeful that this new company – KNOA – will provide a public benefit and will never again sell oxycontin other than under strict guidelines and supervision.

I am hopeful that no other family will ever endure the pain that I have had, watching not one but two sons die of overdose.

I am hopeful that the Sackler family members and Purdue executives and Board members will ultimately be forced to answer for their sins, at the appropriate gates.

I am hopeful that the document repository will educate people for decades to come about the abhorrent actions of Purdue and the Sackler family.

I am hopeful that one day Craig Landau will come meet me and talk to me and just own up to his role as a human being and executive.

I am hopeful that every victim of the opioid crisis will one day find peace. Maybe enjoy a sunset, the changing of the leaves in spring, a high school graduation, or a wedding – even if they cannot do these things with their loved ones who died at the hands of this company and the evil family who ran it.

And I am hopeful that our federal government will examine itself and use the money they received from Purdue to compensate victims - - - sadly I have my doubts.

**I am Cheryl Juaire and my sons are Sean and Corey.**

*UNITED STATES v.* __Purdue Pharma L.P.__

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: __Cheryl A. Juaire__

**Please select one of the following as it relates to your statement that follows:**

☐ I want my statement to be PRIVATE (only accessible to the court, the government, and the defendant)

☑ I want my statement to be PUBLIC (made publicly available on the court docket)

**I would like to be <u>considered</u> to provide an oral statement at the sentencing hearing on April 21, 2026:**

☑ Yes

☐ No

➢ Please note the court has advised that anyone who wishes to make an oral statement <u>must</u> elect to have their statement made public. In addition, the court has determined that it will allow a limited number of individuals to speak at the sentencing hearing. If you are selected to provide an oral statement, you will be informed in advance.

UNITED STATES v. Purdue Pharma L.P.

COURT DOCKET NUMBER: 2:20-cr-01028-MCA

VICTIM NAME: Cheryl A. Juaire

## VICTIM IMPACT STATEMENT

*Completing this form is optional and the questions serve as a guide for potential issues that you and/or your family may have encountered as a result of the offense. Please feel free to draft a letter or submit a Victim Impact statement another way instead of using this form.*

How have you and members of your family been affected by this crime? Feel free to discuss how the crime has affected you and/or your family's health and lifestyle.

I have lost 2 sons to opioid overdose

Have you and/or members of your family received counseling as a result of this crime?

☐ Yes ☐ No

If yes, please explain:

*UNITED STATES v.* Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: _____

## VICTIM IMPACT STATEMENT

If you and/or a family member were a patient of the defendant, did you and/or the family member express any concerns to the defendant in relation to the charged conduct?

☐ Yes    ☐ No

If yes, please explain:

Do you believe the defendant began or contributed to you and/or your family member's addiction?

☐ Yes    ☐ No

If yes, please explain:

Did the defendant prescribe or dispense drugs that resulted in death or bodily injury?

☐ Yes    ☐ No

If yes, please explain:

*UNITED STATES v.* Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: _____

## VICTIM IMPACT STATEMENT

Do you believe the defendant failed to provide necessary care?

☐ Yes  ☐ No

If yes, please explain:

Did the defendant bill you and/or your family member's health insurance for unnecessary procedures or procedures that were never performed?

☐ Yes  ☐ No

If yes, please explain:

Have you experienced any of the following reactions to the crime:

☐ Anger  ☐ Anxiety  ☐ Fear  ☐ Grief  ☐ Guilt  ☐ Chronic Fatigue

☐ Sleep Loss  ☐ Addiction  ☐ Appetite Change  ☐ Sickness

☐ Trouble Concentrating  ☐ Financial Stress  ☐ Depression

Please describe any other reactions to the crime committed.

*UNITED STATES v.* Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: _____

## VICTIM IMPACT STATEMENT

Do you feel the defendant is or will be a threat to you, your family, or the community?

☐ Yes ☐ No,

If yes, please explain:

What else would you like the Court to know about the defendant or your situation as a result of the crime?

If a victim consents, the Court may also make restitution in services in lieu of money, or make restitution to a person or organization designated by a victim. If you are interested in this option, please explain.

*UNITED STATES v.* Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: _____

## VICTIM IMPACT STATEMENT

Please list your actual financial losses from this crime. List only those items for which you have not been or do not expect to be repaid. Please attach receipts or other records that document your losses whenever possible. Please differentiate any monies already repaid by a defendant.

Have you been assessed any additional taxes, penalties, or interest by the federal government as a result of this case? If yes, please explain.

Have you or anyone on your behalf initiated civil action against any party as a result of this offense? If yes, please state the case name, docket number and court of jurisdiction.

If you have suffered any other expenses as a result of this crime, please list them below. Include such items as counseling, medical bills, lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. Please be specific and attach copies of receipts if possible.

**033**

| From: | Michalenes Mission |
|---|---|
| To: | Victimassistance Fraud (CRM) |
| Cc: | ▮▮▮▮▮▮▮ |
| Subject: | [EXTERNAL] Oxy |
| Date: | Monday, April 13, 2026 5:50:05 PM |

I had a car accident 1997, I had an automobile accident. I had back surgery which failed. I went to see a physician down in Philadelphia at ▮▮▮▮▮▮▮▮. He had a clinic. It was called the kind clinic I was diagnosed with CRPS which is very painful and he put me on oxycontin 20 mg. It started off at then another couple months. It got increased to two times a day and a few months later I was on doordashic patches 25 mg and I was still taking the oxycontin. I was also placed on a fentanyl lollipop I was also placed on roxys in addition to everything else.

Needless to say, thinking back now that was like a lot of medication that I was on. It's a miracle that today as I stand here that I am still alive. Unfortunately my daughter is not. She was 22 years old and she passed away. Her name is was michalene she apparently took one of my oxycontins at the age of 12. Apparently she thought it was for a headache and then to find out other instances and when she got prescribed hydrocodone for a procedure she had done had gotten done. She had gotten addicted to medication. Then she was stealing my medicine as well which I didn't even know that was happening. Mind you this is years ago. She's been gone now for 8 years. She passed away in 2018 from an overdose. I watch my child deteriorate through Grand The more maul seizures she was in and out of rehabilitation centers. It did not work. She was injecting heroin. She was injecting fentanyl. She was very well addicted. She was. She was a mess. She was diagnosed with borderline personality disorder and I miss my child dearly. I don't think that there's any fine that could be paid by Purdue pharma that could ever ever make up for my daughter being gone and I know that now being that I am not on those No longer thank God because I was robbed from other people all the time breaking into my house to get my stuff and my siblings even robbed me. They ended up in jail and being addicted as well. I have two brothers that are heroin addicts that are both in jail because of oxycontin. One had robbed to pharmacy because of it and he ended up serving 8 years in jail and this is going back a long time ago now and he's still in jail. He's incarcerated right now. He spent most of his life in prison because of oxycontin and being addicted to it. Most of my family because of these drugs has paid a very harsh penalty their whole life between treatment, jail, deaths fines And none of it will still resolve the rest of our lives to be lived in a normal way because there is no normal way. This had not only impacted my life personally with losing my child. It impacted my other daughter's lives. Their children's lives, their husband's lives. My siblings lives. I have nothing except my daughter and her children that are left. I lost my baby. I buried my baby and no mother should ever have to bury their child. You will walk out of this courtroom still alive. Well a roof over your head money in your pocket. Why we lost everything that we loved. You will serve no jail time where my brothers are in jail for almost all of their life because of drugs that were created by you. They lost their adulthood, their childhood. My grandson is traumatized yet from losing his best friend. She watched him all the time. Everybody misses her. She was very well loved. I advocate all the time I go in the homeless camps. Give out more naloxone than you could ever imagine. I'm community partners with volunteers of America. We do overdose awareness Day in our Park in which we shouldn't even be doing this kind of stuff. We still didn't even grieve our children. I should be living life and I can't. My life stopped the day my daughter died. She will never be back. I will never see her get married. Never see her. Have children. I miss her face. Her beautiful blue eyes. You will lose nothing. A fine is nothing to you. You would just write a check. That's nothing. We lost everything. You guys should lose everything and spend some time in prison because that's what we feel like we are. We are a prisoner.

Thank you, Pamela keefe
Michalenes mom Pennsylvania

Pamela
https://www.ppnepa-michalenesmission.org
Peer Grief Support: 888-696-6654
http://www.vilomahfoundation.com

**034**

| From: | Maureen Kielian |
|---|---|
| To: | Victimassistance Fraud (CRM) |
| Cc: | Maureen; Maureen |
| Subject: | [EXTERNAL] Purdue Pharma 2:20-cr-01028-MCA Victim Statement - with purdue_vis form (Attached) for public reading |
| Date: | Wednesday, April 15, 2026 10:23:54 AM |
| Attachments: | purdue_vis_Kielian Family.pdf |

To the Honorable Court and the United States Department of Justice,

I submit this Victim Impact Statement with profound grief, anger, and urgency, on behalf of my family and the countless others whose lives have been permanently altered by the opioid crisis.

At the outset, it must be stated plainly: the outcomes of this bankruptcy process, which has functioned in practice as a substitute for what should have been full personal injury accountability, have largely benefited lawyers, consultants, government entities, and other institutional actors. Meanwhile, those of us who were directly harmed, and the families who buried our loved ones, remain at the margins.

To many of us, this process feels less like justice and more like a negotiated shield from it.

We do not believe this plea reflects the true magnitude of the suffering, the loss of life, and the lifelong trauma Purdue helped cause. The scale of harm cannot be reduced to financial terms or resolved through a process that prioritizes institutional recovery over human loss.

For the families living with that loss every day, this outcome falls far short of justice.

This case demands a fundamental question be answered: when criminal conduct is knowing, prolonged, and catastrophic in its consequences, why are financial penalties deemed sufficient punishment?

In 2007, Purdue Pharma was held criminally accountable. Purdue pleaded guilty to misbranding OxyContin, specifically for misleading the public and physicians about the drug's risk of addiction, resulting in over $600 million in penalties. No individual was sentenced to incarceration. Despite that prosecution, the same harmful conduct continued. The scope of destruction expanded across the United States, resulting in widespread addiction, overdose, and death. **That history is not incidental. It is proof that prior penalties failed to deter ongoing misconduct**. Financial penalties, no matter how substantial, function as a cost of doing business when imposed on corporations at the expense of human suffering, death, and family and community destruction. They do not deprive individuals of liberty. They do not carry the same deterrent effect. And they do not reflect the value of the lives lost, lives still suffering, and lives forever altered.

Profits must not trump patient and public health safety. Yet in this case, they did.

What occurred here was not an isolated failure. It was the execution of a for-profit business model, one that operated with the knowledge, endorsement, or acquiescence of powerful regulatory and legislative bodies, including the FDA and Congress. That reality does not lessen accountability. It deepens the need for it.

Under our system of justice, individuals who unlawfully distribute controlled substances face

severe criminal penalties, including lengthy imprisonment. Our loved ones are enduring 7 year prison sentences for the possession of merely one OxyContin pill.

Yet here, where the scale of harm is exponentially greater, those responsible for corporate decision-making have avoided incarceration.

**This disparity undermines public trust and erodes the integrity of the justice system.**

The record reflects that vast quantities of opioid medications were distributed while the risks of addiction were known or consciously disregarded. Misrepresentations and omissions in marketing drove prescribing practices that exposed patients, including young individuals, to extreme and dangerous levels of these drugs. Many became dependent while taking medication exactly as prescribed.

This is what makes the harm so profound. It was not hidden in back alleys. It was sanctioned, normalized, and presented as safe.

The consequences have been devastating.

Thousands have lost their children. Thousands more are still suffering the horrid medical condition known as addiction, in this case, iatrogenic addiction. And thousands more are languishing in our prisons without hopeless, without treatment and branded with felony charges which after serving time and paying fines remains a lifetime sentence.

Our families were torn apart. The grief is not theoretical. It is lived every day. It is the empty chair at the table, the silence where a voice should be, and the milestones that will never come. It is birthdays that turn into days of mourning. It too is a lifetime sentence carried by those left behind.

At the same time, many individuals who developed substance use disorders as a direct or foreseeable result of this crisis have been criminalized. Some are incarcerated and therefore unable to submit statements such as this one. This reality reveals a profound inequity: those who suffered the consequences are punished, while those who contributed to creating the conditions for that suffering have largely avoided personal criminal sanction.

Without meaningful individual accountability, the message is clear: catastrophic harm can be negotiated.

That message is unacceptable.

I also respectfully urge the Court to recognize the ongoing and often overlooked harm experienced by families. We carry the emotional, physical, and financial burden of this crisis long after the headlines fade. Any abatement or remedial framework must include dedicated support for family counseling, caregiver assistance, and services for those grieving. To exclude families is to ignore a central and enduring part of this harm.

This crisis was not inevitable. It was the result of deliberate choices, made with knowledge of the risks and in disregard of the consequences.

Justice requires more than acknowledgment. It requires accountability proportionate to the

harm caused.

I respectfully urge the Court to impose penalties that reflect the severity, duration, and human cost of this conduct, including meaningful custodial sentences for the individuals whose decisions contributed to this ongoing public health catastrophe.

Anything less risks affirming a system in which the greater the harm, the less likely it is that anyone will be held personally accountable.

For families like mine, the sentence did not end with a verdict, and it will not be lifted with a settlement. It is constant. It is permanent. It is everlasting.

We ask that the law recognize that truth.

Respectfully submitted by a mom,

*Maureen Mulroy Kielian*



**"Where Recovery Meets Policy"**

*Southeast Florida Recovery Advocates turns lived experience into lasting change. We bring together people in recovery, families, providers, and policymakers to build and champion solutions that work-solutions that are compassionate, cost-effective, and backed by evidence. From prevention to policy, we*

*don't just advocate for better behavioral health care in Southeast Florida, we help create it.*
*(St. Lucie, Martin, Palm Beach, Broward, Miami-Dade)*

UNITED STATES v. **Purdue Pharma L.P.**

COURT DOCKET NUMBER: 2:20-cr-01028-MCA

VICTIM NAME: **Kielian Family**

**Please select one of the following as it relates to your statement that follows:**

☐ I want my statement to be PRIVATE (only accessible to the court, the government, and the defendant)

☑ I want my statement to be PUBLIC (made publicly available on the court docket)

**I would like to be <u>considered</u> to provide an oral statement at the sentencing hearing on April 21, 2026:**

☑ Yes

☐ No

> ➢ Please note the court has advised that anyone who wishes to make an oral statement <u>must</u> elect to have their statement made public. In addition, the court has determined that it will allow a limited number of individuals to speak at the sentencing hearing. If you are selected to provide an oral statement, you will be informed in advance.

UNITED STATES v. Purdue Pharma L.P.

COURT DOCKET NUMBER: 2:20-cr-01028-MCA

VICTIM NAME: **Kielian Family**

## VICTIM IMPACT STATEMENT

*Completing this form is optional and the questions serve as a guide for potential issues that you and/or your family may have encountered as a result of the offense. Please feel free to draft a letter or submit a Victim Impact statement another way instead of using this form.*

How have you and members of your family been affected by this crime? Feel free to discuss how the crime has affected you and/or your family's health and lifestyle.

April 14, 2026

Subject: Purdue Pharma 2:20-cr-01028-MCA Victim Statement

To the Honorable Court and the United States Department of Justice,

I submit this Victim Impact Statement with profound grief, anger, and urgency, on behalf of my family and the countless others whose lives have been permanently altered by the opioid crisis.

At the outset, it must be stated plainly: the outcomes of this bankruptcy process, which has functioned in practice as a substitute for what should have been full personal injury accountability, have largely benefited lawyers, consultants, government entities, and other ⊞

Have you and/or members of your family received counseling as a result of this crime?

☑ Yes ☐ No

If yes, please explain:
25 years of countless efforts to heal my son and our family

*UNITED STATES v.* __Purdue Pharma L.P.__

**COURT DOCKET NUMBER:** __2:20-cr-01028-MCA__

VICTIM NAME: __Kielian Family__

### VICTIM IMPACT STATEMENT

If you and/or a family member were a patient of the defendant, did you and/or the family member express any concerns to the defendant in relation to the charged conduct?

☐ Yes  ☒ No

If yes, please explain:

Do you believe the defendant began or contributed to you and/or your family member's addiction?

☒ Yes  ☐ No

If yes, please explain:

OxyContin is addictive

Did the defendant prescribe or dispense drugs that resulted in death or bodily injury?

☒ Yes  ☐ No

If yes, please explain:

See above statement

*UNITED STATES v.* <u>Purdue Pharma L.P.</u>

**COURT DOCKET NUMBER:** <u>2:20-cr-01028-MCA</u>

VICTIM NAME: <u>Kielian Family</u>

### VICTIM IMPACT STATEMENT

Do you believe the defendant failed to provide necessary care?

☒ Yes ☐ No

If yes, please explain:

Addiction REQUIRES aftercare. Defined as a chronic relapsing medical condition by the AMA

Did the defendant bill you and/or your family member's health insurance for unnecessary procedures or procedures that were never performed?

☐ Yes ☒ No

If yes, please explain:

Have you experienced any of the following reactions to the crime:

☒ Anger ☒ Anxiety ☒ Fear ☒ Grief ☐ Guilt ☒ Chronic Fatigue

☒ Sleep Loss ☒ Addiction ☒ Appetite Change ☒ Sickness

☒ Trouble Concentrating ☒ Financial Stress ☒ Depression

Please describe any other reactions to the crime committed.

UNITED STATES v. **Purdue Pharma L.P.**

COURT DOCKET NUMBER: 2:20-cr-01028-MCA

VICTIM NAME: **Kielian Family**

## VICTIM IMPACT STATEMENT

Do you feel the defendant is or will be a threat to you, your family, or the community?

☑ Yes  ☐ No,

If yes, please explain:

As long as the Sackler Family is doing business, and not in jail, harm will continue. No doubt given the history that another drug will be approved and cause damage.

What else would you like the Court to know about the defendant or your situation as a result of the crime?

This is not justice. Prison is the only justice for knowingly causing death and suffering - for profit.

If a victim consents, the Court may also make restitution in services in lieu of money, or make restitution to a person or organization designated by a victim. If you are interested in this option, please explain.

Interested as there is no cost to cover the now 25 years of suffering on my family. The financial devastation far exceeds millions of dollars.

UNITED STATES v. Purdue Pharma L.P.

COURT DOCKET NUMBER: 2:20-cr-01028-MCA

VICTIM NAME: Kielian Family

## VICTIM IMPACT STATEMENT

Please list your actual financial losses from this crime. List only those items for which you have not been or do not expect to be repaid. Please attach receipts or other records that document your losses whenever possible. Please differentiate any monies already repaid by a defendant.

Countless and past the FL statute of record retention

Have you been assessed any additional taxes, penalties, or interest by the federal government as a result of this case? If yes, please explain.

Have you or anyone on your behalf initiated civil action against any party as a result of this offense? If yes, please state the case name, docket number and court of jurisdiction.

If you have suffered any other expenses as a result of this crime, please list them below. Include such items as counseling, medical bills, lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. Please be specific and attach copies of receipts if possible.

036

| | |
|---|---|
| **From:** | Renate LeDuc |
| **To:** | Victimassistance Fraud (CRM) |
| **Subject:** | [EXTERNAL] Victim Impact Statement |
| **Date:** | Monday, April 13, 2026 1:50:53 PM |

Purdue created the opiate epidemic which has affected my family in tragic ways.

First, the evolution of the fentanyl crisis from the opioid epidemic caused the death of my son, Jeremy LeDuc on June 5, 2017. He did not know he was taking fentanyl and was poisoned. My family will never be the same and will be suffering with this grief forever.

My husband, Robert LeDuc was also a victim of this epidemic. He had back surgery in September 2011. His doctor prescribed OxyContin and kept increasing the dose when he became tolerant to it and it wasn't working anymore. He was advised that it wasn't really that addictive. I assume this is what he was told by his drug reps. Robert continued to be prescribed OxyContin through 2 knee replacements and Cancer. He was up to 280 milligrams when he took it upon himself to see an addictions doctor. He is now on suboxone and is having trouble getting off of that. He always thought his surgeries and illness was causing increased pain when it was actually the withdrawals from addiction.

The emotional loss and pain for our family has had tremendously more impact than the financial losses of a funeral and the cost of medicines caused by this Opioid Epidemic started by Purdue and Big Pharma. I don't understand why there wasn't more widespread knowledge at the time when people were dying in Virginia since 1999/2000.

Renate and Robert LeDuc
and our son Jeremy LeDuc
(Forever in our Hearts)

**039**

| | |
|---|---|
| **From:** | Sonya Maaa |
| **To:** | Victimassistance Fraud (CRM) |
| **Subject:** | [EXTERNAL] Witness testimony |
| **Date:** | Friday, April 10, 2026 1:13:11 PM |

My child broke her leg in 2017 and was given the drug. She became addicted to the drug and once she couldn't get it she started taking anything she could. Then she got pregnant with my granddaughter and still took drugs while pregnant. My grandchild was born addicted to drugs and spent a month and a half in the NICU. She lost custody of her and to this day I still have her. We don't know what her future will hold because we don't know what the outcome of being born in the drugs will have in the future. I pray daily that she will be fine. And her future will be great.

Thank you,

Sonya Maas

**040**

UNITED STATES v. _Purdue Pharma L.P._____

COURT DOCKET NUMBER: _2:20-cr-01028-MCA_____

VICTIM NAME: John C. Parker (Amber Parker Mangan)

## VICTIM IMPACT STATEMENT

*Completing this form is optional and the questions serve as a guide for potential issues that you and/or your family may have encountered as a result of the offense. Please feel free to draft a letter or submit a Victim Impact statement another way instead of using this form.*

How have you and members of your family been affected by this crime? Feel free to discuss how the crime has affected you and/or your family's health and lifestyle.

The loss of my father has had a devastating and lasting impact on my family. We experienced emotional trauma watching him change due to addiction, and his death has left a permanent void in our lifes. We lost not only a father, but also a source of support, guidance, and stability.

This has effected our mental and emotional well-being and has made it difficult to cope with grief.

Have you and/or members of your family received counseling as a result of this crime?

☒ Yes  ☐ No

If yes, please explain:

Yes. Due to the trauma of watching my father struggle with 'addiction' after taking 'Oxycontin and the impact of his death, counseling has been necessary to help process emotion, pain and loss.

UNITED STATES v. _Purdue Pharma L.P._

COURT DOCKET NUMBER: _2:20-cr-01028-MCA_

VICTIM NAME: _John C. Parker (Amber Parker Mangan)_

**VICTIM IMPACT STATEMENT**

Do you feel the defendant is or will be a threat to you, your family, or the community?

☒ Yes   ☐ No,

If yes, please explain:

The actions of the defendant contributed to a widespread opioid Crisis. The promotion and distribution of highly addictive medications like OxyContin continue to put families and Communities at risk.

What else would you like the Court to know about the defendant or your situation as a result of the crime?

My father was not a addict before being prescribed Oxycontin. He was a hardworking man who trusted medical professionals and followed their instuctions. This medication Changed his life and Ultimately my family he had four daughters ages 17,16, twins 5 when he lost life

If a victim consents, the Court may also make restitution in services in lieu of money, or make restitution to a person or organization designated by a victim. If you are interested in this option, please explain.

Yes, I am interested I feel they Should be able to pay the familys from trusts or they should be Charged for murder for every person that lost a life from this drug.

UNITED STATES v. **Purdue Pharma L.P.**

COURT DOCKET NUMBER: 2:20-cr-01028-MCA

VICTIM NAME: John C. Parker (Amber Mangan)

## VICTIM IMPACT STATEMENT

Please list your actual financial losses from this crime. List only those items for which you have not been or do not expect to be repaid. Please attach receipts or other records that document your losses whenever possible. Please differentiate any monies already repaid by a defendant.

Whats the amount you put on a life a father not being at all four of his daughters graduations or walking

Have you been assessed any additional taxes, penalties, or interest by the federal government as a result of this case? If yes, please explain.

No

Have you or anyone on your behalf initiated civil action against any party as a result of this offense? If yes, please state the case name, docket number and court of jurisdiction.

No

If you have suffered any other expenses as a result of this crime, please list them below. Include such items as counseling, medical bills, lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. Please be specific and attach copies of receipts if possible.

Copy of 30.00 for a theropist over the Course of 5 years.

UNITED STATES v. Purdue Pharma L.P.

COURT DOCKET NUMBER: 2:20-cr-01028-MCA

VICTIM NAME: John C. Parker (Amber Mongan)

VICTIM IMPACT STATEMENT

Do you believe the defendant failed to provide necessary care?

☒ Yes ☐ No

If yes, please explain:

I believe the defendant know what they did to the medical field by pushing this drug over and over to become Rich because they know the addicting side effect

Did the defendant bill you and/or your family member's health insurance for unnecessary procedures or procedures that were never performed?

☐ Yes ☐ No   Unknown Answer

If yes, please explain:

Have you experienced any of the following reactions to the crime:

☐ Anger ☒ Anxiety ☐ Fear ☒ Grief ☐ Guilt ☐ Chronic Fatigue

☐ Sleep Loss ☐ Addiction ☐ Appetite Change ☐ Sickness

☒ Trouble Concentrating ☐ Financial Stress ☒ Depression

Please describe any other reactions to the crime committed.

My sisters doesn't Remember alot of her Childhood because of the trauma we had as kids from our fathers addiction, Then Death when 17, 16, twins 5 years old.

UNITED STATES v. <u>Purdue Pharma L.P.</u>

COURT DOCKET NUMBER: <u>2:20-cr-01028-MCA</u>

VICTIM NAME: <u>John C. Parker (Amber Parker Mangan)</u>

**VICTIM IMPACT STATEMENT**

If you and/or a family member were a patient of the defendant, did you and/or the family member express any concerns to the defendant in relation to the charged conduct?

☒ Yes  ☐ No

If yes, please explain:

My family feels that Purdue should pay for what they have done to family's like mine they have money in trusts, family lost lives over their Rich lifestyle.

Do you believe the defendant began or contributed to you and/or your family member's addiction?

☒ Yes  ☐ No

If yes, please explain:

My father was a hard working man before he was prescribed Oxycotin twelve 80mg tablets Daily. This changed my father and started his addiction which lead to death.

Did the defendant prescribe or dispense drugs that resulted in death or bodily injury?

☒ Yes  ☐ No

If yes, please explain:

My father's addiction to Oxycontin led to his death. What began As prescribed medication turned into a life threating dependency. He trusted that the medication was safe and used it as directed, but it ultimately took his life.

*UNITED STATES v.* ___Purdue Pharma L.P.___

**COURT DOCKET NUMBER:** ___2:20-cr-01028-MCA___

VICTIM NAME: ___John C. Parker (Amber Mangan (Parker)___

Please select one of the following as it relates to your statement that follows:

☐ I want my statement to be PRIVATE (only accessible to the court, the government, and the defendant)

☒ I want my statement to be PUBLIC (made publicly available on the court docket)

I would like to be <u>considered</u> to provide an oral statement at the sentencing hearing on April 21, 2026:

☒ Yes

☐ No

> ➢ Please note the court has advised that anyone who wishes to make an oral statement <u>must</u> elect to have their statement made public. In addition, the court has determined that it will allow a limited number of individuals to speak at the sentencing hearing. If you are selected to provide an oral statement, you will be informed in advance.

**041**

| | |
|---|---|
| **From:** | Glenn McKinstry |
| **To:** | Victimassistance Fraud (CRM) |
| **Subject:** | [EXTERNAL] Fwd: Opiode Crisis (Formal Complaint Malpractice Garrison Family Physicians Lakewood, CO. & Walgreens & King Soopers both Wheatridge, CO.) |
| **Date:** | Saturday, April 11, 2026 3:53:13 AM |

To Whom it may concern in reference to Victims Impact statement. Please Assist me in this situation and how to send in all this for a Victim Impact Statement.


I want to include the following in my victim impact statement. I need to include that in 2004 I was placed on a bi-pap machine from the prescriptions I was given from 2001 - 2016. I will be required to use the Bi-Pap machine for the rest of my life.

I was also sleeping 18 house a day non stop and urinating in my bed during that 18 hours of coma from the  prescriptions given from ███████████████ Lakewood, CO.

I have multiple neurology damages and disabilities from the improper prescription of medication for a known Alcohol which ███████████████ prescribed me medication for alcoholism along with dangerous high doses of pharmaceuticals including but not limited to Diloted, Xanax 6 MG, Valium 30 MG,  Ambien 10 MG, Flexorol 30 MG, propranolol HCL 120 MG, Ridelin 129 MG.,
And many other medications that should not have been given to an individual person and should have been monitored by a faculty not for individual usage.

Please pull my pharmaceutical history to see how not only Purdue Pharmaceuticals and all three Doctors from ███████████████ in Lakewood, CO. As well as all three pharmacies and the pharmacist's distributing the excessive doses of Medications.

I lost my job and was diagnosed in November 2006 by VA as 100% Totally and permanently DAV Service Connected because of use of pharmaceuticals. I have not been able to work since then because of inappropriate prescriptions of medications to me by ███████████ ███████ in Lakewood, CO.


Please assist me.

Thank you,
Mr. **Glenn McKinstry**

███████████████


Begin forwarded message:


**From:** Glenn McKinstry ███████████████ >

**Date:** February 9, 2026 at 10:00:45 CST
**To:** ███████████████

**Subject: Opiode Crisis (Formal Complaint Malpractice** ███████
███████████████████████████ **both Wheatridge,**
**CO.)**

████████████████████████████

I am a 100% DAV service connected veteran who lives in Lincoln NE., and I am asking for assistance in this situation.

I am attaching my e.mail I wrote to CO DORA in September 2020 after using all information I provided in this forwarded e-mail to submit a complaint against Purdue Pharmicudicales with an accepted claim of 61 Million. I mention this only because the court which accepted this in July 2020 states malpractice of Purdue and its affiliates.

CO DORA said none of the MD's from ███████████████████ nor any Pharmacy mentioned in my complaint in September 2020 did malpractice.

Please assist me with this complaint because my complaint is an American issue. I have been off all pharmaceuticals other than Blood pressure medication since May 2016 (10 years).

I sent over 40 pages of documents to support my complaint of Malpractice to the three MD's mentioned as well as three Pharmacies/ Pharmacists who also did Malpractice.

If Purdue Pharmaceuticals fells Malpractice against them there must be some law against all three MD's I seen for nearly 15 years as well as the three pharmacies.

Please assist me with this complaint, or direct me to assistance.

Thank you for your assistance.

Mr. Glenn McKinstry



Begin forwarded message:

**From:** Glenn McKinstry ███████████████

**Date:** September 25, 2020 at 10:05:54 CDT
**To:** Glenn McKinstry < ██████████████ >
**Subject: Formal Complaint Malpractice**

██████████████████

I am a 100% DAV Service Connected, Totally and Permanently Disabled (Handicapped). Under the AWD Act I request assistance in my filing my complaint to assure both the accuracy and efficiency of my complaint against ████████████████████████████ . & ████████████████ and ███████████████ in Wheatridge, CO.  Including In this complaint, but not limited to: Dr. ████████████████████████

Besides ████████████ ████████████ I am including also Both ███████████ in Wheatridge, CO and ██████████ ██████████ ( ████████████ ) in Wheatridge, CO. I will separate each point by ***.

I authorize CO DORA to pull both my medical and Psychological records
    as well as my National Database of Pharmaceuticals
    from both the VA, and any other medical records from Medicare, TriCare, AARP or
    any other Insurance Companies.  FYI  I had at least two other insurance companies
    during 2000 - 2016.  One from Radiology Specialist of Denver from October 2000
    until February 2004, and one from Catholic Health Insurance from February 2004
    until September 2006.

**\*\*\* History & Fraud to Insurance Companies by Misdiagnosis of Condition(s) / Problem(es) for office visit:**
When I came to ████████████████████ in Lakewood CO I was diagnosed as 50% DAV Service Connected with Psychological diagnoses and on Psychotropic Medication by the VA.  I gave all medications and diagnoses to ████████████ on first day of appointment at ████████████████ in Lakewood, CO.  I originally found ██████████████████████ in Lakewood, CO when I searched Denver and / or Lakewood CO DEX Yellow Pages in 2001 or 2002 under Weight Loss finding Dr. ████████████ ████████████████████ in Lakewood, CO.  Within a week, I was on a Diet Drug something from (Fen/Fen), but still approved at that time.  I was on that for less than 6 month by which time I was

diagnosed by Dr. ███████████ with no Psychology Licenses or Certifications, as being ADHD (Around the age of 40) and he prescribed me Ridaline leading to the dose of ██████████████ dosage) and no longer on the Diet Drug previously on.

I felt meeting with ████████████ @ ██████████████████, was a Counceling session and then set up monthly appointments with █ ██████████ every month on the first Monday of each month at 13:00 hrs. Every December I scheduled my entire year and when I bought a calendar I filled in █████████████████████ office visits first things into my calendar. I was seeing ██████████ every month and at one point I had a lung infection either Bronchitis or Phenomia and I had to see ████████████ every sing week for about 3 weeks or so I asked ████████████ if he would not get paid by my Insurance if I had to see him every week, and he looked at my chart and said, don't worry about that ever happening, because you have enough disabilities and or diagnosis codes that I could see you every week for a year and still get paid from all the insurances with no problem ever. This was ████████████ admitting that he could always get paid by insurance even if he has to change the office codes to either extend the time or change the office visit or acuity of a condition. This denotes Fraud on Insurance claims to get paid more for an extended visit, etc.

I want all Medical charges from 2001 or 2002 first day at ██████████ ██████████████ through May of 2016 to be pulled and to be compared to all my Medical charges to include VA paid Medical charges to be compared between May 2016 through current time. Comparing all ███████████████████ Billing to be compared to all billing from April 2016 through the current time would be a close basis for Insurance Fraud to include excessing or wrongly billing or coding or naming of office visits and to extend time to maximum for no particular reason for the visit. I know one time I was in his office waiting over an hour for him or someone in the office and after meeting the physician for 5 - 10 minutes I see on Billing from Medicare and or TriCare a charge for extended office visit 90 minutes. NOT at all, why should Medicare or any insurance company have to pay for a Dr. not showing up to his appointment and adding his lateness to work to be added to his office visit on the patient. That is Fraud from my basic knowledge, you decide.

     (I have a request to ████████████ to find out the exact date my first appointment was and they told me their records nor even their old records do not go back that far. They will get back to me with a date if they are able to find it.)

They never got back with exact date and said they do not have my medical records back to 2001.

***     **Mental/ Physical Disabilities Injury(ies) / Disability(ies):**

I currently have a constant and or continual cervical injury(ies) / disability(ies) In my claim against Purdue Pharmaceutical; I used the following but not necessarily limited to: Cervical Dystonia, and / or Cervical Dyskinesia, and / or Cervical Neck Twitch's, and / or Cervical Spasms. This can include but not be limited to: a constant and / continual restlessness, nervousness, tension9s), and / or muscle spasms in my neck (Cervical Vertebrae). My husband Steven Patrick Hogan-Mckinstry told ████████ at the first visit after he moved to CO. in September 2015 or early October 2015, that I had a Severe Cervical Twitch and it was more than likely caused by the Felxorile or one of the many other medications I was on at that time and he felt Flexorile should be the first to be removed from my prescriptions and ████████ agreed to no longer prescribed Flexorile to me, at which time Steven tapered me off ALL of my medications that where being prescribed but not needed by me or anyone, which were everything ████████ ████████ had ever prescribed me. Especially any prescriptions prescribed as a PRN (As needed) for Doliated or any other Psychotropic medications given to a patient with an obvious alcohol issues, and if any Drs. At ████████████ cared for an obvious "addict" they would have checked All of my prescriptions and suggest to ████████ to suggest a rehabilitation for an obvious drug addiction and maybe abuse.

*** **Improper Prescriptions causing Multiple Overdose(s):**
Overdose(s): Pharmacy please look into this if Medical Board does not look at Pharmacy. Multiple Overdose(s) just looking at all the prescriptions I was taking shows overdose(s) and the combination of the prescriptions that I was on should have only been given out at a facility that would dispense them to any patient and should not have been given out to any patient with known alcohol issues. The only thing that kept me alive was my Bi-Pap Machine issued by VA during sleep with the doses of medication that I was on.

***     **Addiction to Drugs/ Alcohol  Addiction/ Dependence/ Substance Use Disorder:**

Addiction/ Dependence/ Substance Use Disorder: Pharmacy please look into this if Medical Board does not look at
Pharmaceutical causing: Addiction/ Dependence/ Substance Use Disorder.

*** **Lost Wages/ Earning Capacity:**
Lost Wages/ Earning Capacity: I used in Perdue Pharmaceuticals $50,000 per year my last known income from CHI in Colorado from 2006 through 2026 (When I turn 65 years old), = 20 years.
Note also in 2014 - 2015 I took and paid for education / training

and was a Licensed MT in CO DORA for 2016 and a Licensed MT in ME for 2017, however because of my recovery from Addiction to Drugs/ Alcohol/ Dependence/ Substance Use Disorder I was not able to go to work.  This shows I attempted to try another job other than what I had done prior to my Addiction to Drugs/ Alcohol/ Dependence/ Substance Use Disorder.

\*\*\* **Injuries / Damages:**
For Injuries / Damages I used $1,000,000.00 (I Million Dollars) per year from years 2006  - (November 2006 I was made 100% DAV Serviced Connected both Permenant and Totally Disabling.).  through 2026 (When I turn 65 years old), = 20 years.

\*\*\* **Other Claims:**
For Injuries / Damages I used $1,000,000.00 (I Million Dollars) per year from years 2006  - (November 2006 I was made 100% DAV Serviced Connected both Permenant and Totally Disabling.).  through 2026 (When I turn 65 years old), = 20 years.

\*\*\*        **Expenses forTreatment:**
Expensed for Treatment: I use $!,000,000.00 (1 Million Dollars) per year after taxes to start as of September 04, 2015 throughout current time; and to be extended annually on September 04th of each year as long as I stay away from any illegal drugs.

\*\*\*        **WITNESSES...**

\*\*\*      Witnesses to include but not be limited to both my physical and psychological medical records, and any and or all names of my witnesses below, and or any names provided at a future date if requested or remembered.

\*\*\*     Dr. ███████████████████████████, CO.



Knows about my Alcohol and Drug use/ abuse/ addiction/ dependency, etc.
Knows about all accidents and drug prescriptions from around

2001 through 2016!

\*\*\* ███████████ . Retired from the VA Medical Center
Denver, CO.
████████████████        ███████████ .
    Westminster, CO ████
Knows about my Alcohol and Drug use/ abuse/ addiction/
dependency, etc.

\*\*\*. ███████ s. Retired from the VA Medicine Center Denver,
CO.
████████████████████████    ███████████
    Commerce City, CO ████
Knows about my Alcohol and Drug use/ abuse/ addiction/
dependency, etc.


\*\*\* ███████████ . Retired from the VA Medical Center Denver
CO.
████████████████ .    █████████
    Lakewood. CO
Knows about my Alcohol and Drug use/ abuse/ addiction/
dependency, etc.

\*\*\* ███████████ , Lakewood, CO used to be office Manager
████████████████ .
  Knows about my Alcohol and Drug use/ abuse/ addiction/
dependency, etc.

\*\*\*. █████████████████ , Lakewood, CO.
██████████ ██ ███████

Knows about my Alcohol and Drug use/ abuse/ addiction/
dependency, etc.

\*\*\* ███████████ Aurora, CO.
███████ was my supervisor for over a year when I
volunteered at the front desk of the Denver Gay & Lesbian
Center.
    Knows about my Alcohol and Drug use/ abuse/ addiction/
dependency, etc.

\*\*\* Dr. ███████ of VA Medical Center, Baltimore, MD.
    Dr. ██████ called ████████████ , and
contacted ████
around October or November of 2015, saying that as a Family
Practice MD,
he has no ethical reason for prescribing "PsychoTropic Medications

to any
patient for an extended period of time, with no Psychiatrist Certificates."

Add to this the fact that the VA was going to remove me from all medications

Prescribed to me at that time due to their addictive properties.

Knows about my Alcohol and Drug use/ abuse/ addiction/ dependency, etc.

Spoke to ██████████ in 2016.

*** Steven Patrick Hogan-McKinstry (on February 14, 2016, my husband.), Winterport, ME. (207) 814-0616.

Steven Patrick Hogan was a RN for 30+ (over 30) years, he was last Licensed in Lincoln, NE. On Father's Day 2009 Steven had a seizure

Including breaking 2 locations in his thorax and also severe osteoporosis and at that time could not physically do the job he could do the job

other than physically; after which time he told the Nursing Board that he could not physically preform the job of RN 100% so

he gave up his own license on his own. I also know that in 2015 - 2016 Steven Patrick Hogan paid for on his own, and completed all

required classes and courses from a Lincoln NE hospital and all he had to do in March or April 2016 is spend 2 (two) weeks at a

hospital in Lincoln, NE and he would have his RN license at the end of these two weeks.  So the only reason Steven Patrick

Hogan-McKinstry is not a RN as of 2016 is solely because of me, I married him and we decided that we were moving to ME, so

he was only two weeks from his RN license in 2016 at the time when we moved to ME. While Steven is not a licensed RN today

because of me; however I am not still addicted to Prescription Drugs, nor using Heroine or any kind of illegal drugs. You can verify

this by the fact that ██████████ was going to take me off all medication I was on and I was told this by the VA I would be taken

off all medications I was on which were addictive which was nearly all.

Knows I was sleeping 18 hours a day when I started reducing my Medications.

Knows about my Alcohol and Drug use/ abuse/ addiction/ dependency, etc.

*** (((NOTE... FYI: I have a current and active (Permanent Restraining Order) against ██████████████ May 1966 of Denver, CO;

however he was a regular patient of ██████████
██████ seeing ██████████████, and he would be a witness to my

sleeping 18 hours a day, at which time I went to Dr.

████████ and told him That I was sleeping 18 hours a day and that should be in my

medical records, after which time he started reducing some Xanax.

*** ████████████████████ Denver, CO (former patient of ████████████████ )

(((If he is contacted for this claim (I have no desire, nor any need, nor am I legally

allowed to, nor want to communicate with him because of my Permanent

Restraining Order from Jefferson County, CO. As of January 2016. My restraining

order has been updated in a second time in 2016 for stalking In Waldo County, ME,

and a third time in (2017 or 2018) for stalking again In Waldo, County, ME., and a

fourth time for Stalking in February 2020 In Waldo county, ME.

Knows I was sleeping 18 hours a day when I started reducing my Medications.

Knows about my Alcohol and Drug use/ abuse/ addiction/ dependency, etc.))) ***.)))

Thank you for taking my Formal Complaint Malpractice ████████ ████████████████████████ . & ████████ & ████████

both Wheatridge, CO.

Mr. Glenn McKinstry

████████████████████



# COLORADO
**Department of Regulatory Agencies**
Division of Professions and Occupations

September 22, 2020

Glenn McKinstry
PO Box 530
Winterport, ME  04496-0530

RE: ███████████    ███████████    ███████████

Dear Mr. McKinstry,

Your complaint regarding ██████████████████████████████ has been received by our office. Cases have been opened based upon the information you have provided. Please refer to the attached Consumer Guide for information regarding the complaint process. After you have reviewed the Consumer Guide, please contact our office if you have any questions regarding matters not addressed.

While we are happy to assist you with your complaint, please bear in mind that we cannot provide legal advice.

Please note you will be advised in writing of the final disposition of the complaint. Thank you for informing us of this matter.

Sincerely,

For the Colorado Medical Board

███████████████

Becky Van Meter
Compliance Monitor

Enclosure



1560 Broadway, Suite 1350, Denver, CO 80202   P 303.894.7800   F 303.894.7692   www.colorado.gov/dora/dpo

**Consumer Guide**

The Division of Professions and Occupations (DPO) is one of several divisions within the Department of Regulatory Agencies (DORA). DORA's mission is Consumer Protection. DPO holds the responsibility of regulating more than 440,000 licensees, certificate holders, registrants and businesses. This responsibility includes ensuring individuals with appropriate training and education are issued licenses, registrations and certifications, reviewing complaints, determining appropriate discipline when warranted, promulgating rules for the various professions and businesses, and implementing legislation in regards to the professions and businesses as determined by the Colorado State Legislature. A complete list of these professions and businesses can be found at www.colorado.gov/dora/dpo. This site also contains information regarding license, registration, certification, and disciplinary status.

Some of the professions regulated by DPO have boards that are charged with enforcing the regulation of the profession or business while others have advisory committees that provide advice to boards or the Division Director (Director), and others are programs that have oversight by the Director. The structure of each of these programs is determined by the legislature via the professions' or business' practice act.

**Complaints**

The Division processes over 5,600 complaints annually for its regulated professions. Division staff reviews each complaint upon receipt for jurisdiction and completeness. If the program does not have jurisdiction to review the complaint, the complainant will be notified and provided with additional resources if they are available. If additional information is needed to process the complaint, Division staff will notify the complainant of the necessary information to process the complaint. There are times where jurisdiction cannot be determined without processing the complaint. Once a complaint is complete and determined to be within the jurisdiction of the program, a case is opened and the complainant is notified. The licensee is then notified of the complaint and provided a period of time, typically 30 days, to provide a response to the complaint. The licensee is required to provide any records they have pertaining to the complaint, including patient medical records. Upon receipt of this information, Division staff provides the complaint, the response, and all other available information, to the board or Director to make a determination regarding the allegations within the complaint. It is possible that through the complaint process other issues not originally outlined in the complaint may be found and determined to be violations of the corresponding practice act. In certain instances, Division staff may refer a complaint directly to the Division's Office of Investigations (OI) for further information. These instances can include, but are not limited to, sexual contact, impairment or abuse of drugs or alcohol, concerns regarding safety to practice or safety to the public, unlicensed practice, and fraud.

Once the board or Director makes a determination in a case, several options are available.

- The board or Director may need additional information and OI may be utilized to gather that information. This can include the subpoena of information, witness interviews and the assistance of law enforcement.
- If there is no violation of the practice act, the board or Director will dismiss the complaint. A dismissal does not mean that the board or Director in any way condones the behavior of the licensee. The law requires a violation of the practice act in order for the board or Director to take disciplinary action meaning that when there is no violation of the practice act the only option available to the board or Director is dismissal. Both the licensee and the complainant will be notified of this outcome.
- Many of the practice acts allow for a dismissal with a "confidential letter of concern" to the licensee. Generally, Colorado law prohibits disclosure of letters of concern to the complainant and the public. In this situation, the



licensee would receive the confidential letter of concern and the complainant is notified that the complaint is dismissed.

- If it is determined that an individual is practicing without the appropriate credentials the program could issue an Order to Cease and Desist.  This is a public document that will be shared with both the individual who the complaint is against as well as the complainant.

- There is also various discipline that can be imposed on a licensee to include:
  - Letter of Admonition – this letter is a public disciplinary document that reprimands the licensee for a violation of the practice act or rules.  There is an appeal period of 20 days. The complainant is notified once the action is final.
  - Stipulation – a stipulation is an agreed upon disciplinary action that can incorporate various requirements of the licensee including probation, a period of suspension, practice monitoring, required mental health or substance abuse treatment, payment of a fine, continuing education, or limitation to practice. The complainant is provided with a copy of the stipulation.
  - Revocation or relinquishment – in more extreme circumstances a licensee may no longer be safe to practice and the board or Director may ask the licensee to relinquish their license or require the license to be revoked. The complainant is provided with a copy of this action.
  - In certain circumstances, the board or Director may ask a licensee to voluntarily cease practice for a period of time.  This agreement is typically imposed to provide the board or Director time to determine whether or not the individual is safe to practice or if there is pending criminal action.  If there is concern for the health, safety, or welfare of the public, the board or Director could impose a summary suspension which requires the licensee to cease practice for a period of time. The complainant is provided with a copy of this action.

All public disciplinary actions are available on the DPO website attached to the corresponding licensee's record.  Additionally, for healthcare professions there is a requirement to report discipline to the National Practitioner Data Bank.  There may also be a requirement to report other professions, including healthcare, to the profession's national association.

**Due Process Rights of a Licensee**

All licensees have the right to a formal hearing regarding findings of the board or Director.  Hearings are conducted by an Administrative Law Judge (ALJ) at the Office of Administrative Courts (OAC).  At the hearing, witnesses and evidence may be presented by the Office of the Attorney General on behalf of the board or Director.  The licensee may be represented by an attorney.  In these cases, the ALJ issues an Initial Decision, making findings on the credibility of witnesses, conclusions of law, and may recommend disciplinary sanctions where appropriate.  The findings and recommendations of the ALJ may then be affirmed, modified or rejected by the board or Director.  A final order is issued which becomes a public record. The complainant is provided with a copy of the final order.  The licensee has the right to appeal the final order to a higher court.

**How long until I find out what happened to my complaint?**

The majority of the complaints reviewed in the Division are resolved within 6 months.  Complaints that require additional investigation, or are subject to formal discipline may take longer. There are various times throughout the process when Division's staff may notify a complainant including the initial acknowledgement of the complaint, referrals to OI or the Office of the Attorney General, if the case remains open in the program area over 6 months and upon any public action taken against the licensee by the board or Director.   If you have questions throughout the process, please contact our office for an update.



**Complaint Confidentiality**

During the investigation of a complaint the information regarding the complaint is likely not available to the public depending on the corresponding practice act. That means the licensee's response to the complaint is not made available to the complainant.

**Patient Medical Records**

While Boards and the Director may receive and review a patient's medical records as part of the complaint process, the law does not permit the Board to release or disclose the contents of a patient's medical records to anyone, including the patient.  Patients do, however, have a right to obtain a copy of their medical records directly from their healthcare provider pursuant to sections 25-1-801 and 25-1-802 of the Colorado Revised Statutes.



UNITED STATES v. **Purdue Pharma L.P.**

COURT DOCKET NUMBER: 2:20-cr-01028-MCA

VICTIM NAME: Glenn Frederick Mckinstry f.n.a. Gregory Leonard Vincent

**Please select one of the following as it relates to your statement that follows:**

☐ I want my statement to be PRIVATE (only accessible to the court, the government, and the defendant)

☑ I want my statement to be PUBLIC (made publicly available on the court docket)

**I would like to be <u>considered</u> to provide an oral statement at the sentencing hearing on April 21, 2026:**

☑ Yes

☐ No

> ➤ Please note the court has advised that anyone who wishes to make an oral statement <u>must</u> elect to have their statement made public. In addition, the court has determined that it will allow a limited number of individuals to speak at the sentencing hearing. If you are selected to provide an oral statement, you will be informed in advance.

*UNITED STATES v.* <u>Purdue Pharma L.P.</u>

**COURT DOCKET NUMBER:** <u>2:20-cr-01028-MCA</u>

VICTIM NAME: <u>Glenn Frederick Mckinstry f.n.a. Gregory Leonard Vincent</u>

## VICTIM IMPACT STATEMENT

*Completing this form is optional and the questions serve as a guide for potential issues that you and/or your family may have encountered as a result of the offense. Please feel free to draft a letter or submit a Victim Impact statement another way instead of using this form.*

How have you and members of your family been affected by this crime? Feel free to discuss how the crime has affected you and/or your family's health and lifestyle.

Overdose, Addiction/Dependence/ Substance Use Disorder, Loss of Wages/Earning Capacity, Injury/Disability including but not necessarily limited to): Cervical Dystonia, and/or Cervical Dyskinesia, and/or Cervical Neck Twitch, and/or Cervical Spasms. I was prescribed and too from 2001 or 2002 through May 2016 (14 or 15 years) the following:
Dilodid, along with other sleeping medication including and not limited to: Ambien and other sleeping medications, Benzodiazepines, (Valium and Xanax), Ritalin, Flexo rile, many other medications including Ende role (Propranolol HCL), Depakote (Valproic Acid) as well as other Codeine Based Medications which caused severe allergic reaction of severe Hives thus the use of Dila did prescribed by my Primary care Doctor's ███████████████
█████████████████████ of ████████████████ of Lakewood, Colorado. It had taken me nearly 10 years now to start my recovery process from Dila did as well as all Codeine Based medications also in my claim including but not necessarily limited to: Overdose, Addiction/Dependency/Substance Use Disorder, loss of wages/Earning ➕

Have you and/or members of your family received counseling as a result of this crime?

☑ Yes ☐ No

If yes, please explain:
I have been in Counseling every since I stopped taking the excessives doses of Medications.

UNITED STATES v. **Purdue Pharma L.P.**

COURT DOCKET NUMBER: 2:20-cr-01028-MCA

VICTIM NAME: Glenn Frederick Mckinstry f.n.a. Gregory Leonard Vincent

## VICTIM IMPACT STATEMENT

If you and/or a family member were a patient of the defendant, did you and/or the family member express any concerns to the defendant in relation to the charged conduct?

■ Yes ☐ No

If yes, please explain:

I had brought up my addiction and high dosed of medication with my Doctors at ▮▮▮▮▮
▮▮▮▮▮▮▮▮ in Lakewood CO and I was assured that the medications were all required for me.

Do you believe the defendant began or contributed to you and/or your family member's addiction?

■ Yes ☐ No

If yes, please explain:

As stated my prescriptions were all taken as prescribed and I was on all the medication I mentioned all in one day period for nearly 15 years. This caused my Multiple Nerological disabilited.

Did the defendant prescribe or dispense drugs that resulted in death or bodily injury?

■ Yes ☐ No

If yes, please explain:

As stated I have multiple disabilites inlucing Neck spams, Terret Like Sysmptoms including Vocal noise outbursts, I am required to be on a Bi-Pap Machine for the rest of my life. I have been in Psychiatrict Counseling for years because of my addiction/overdose/dependency.

*UNITED STATES v.* Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Glenn Frederick Mckinstry f.n.a. Gregory Leonard Vincent

**VICTIM IMPACT STATEMENT**

Do you believe the defendant failed to provide necessary care?

☑ Yes  ☐ No

If yes, please explain:
I should not have been giving the dosed of medication prescribed at home the amounts would have to have been monitored and it was not monitored.

Did the defendant bill you and/or your family member's health insurance for unnecessary procedures or procedures that were never performed?

☑ Yes  ☐ No

If yes, please explain:
I have noted in my claim to CO DORA in 2020.

Have you experienced any of the following reactions to the crime:

☑ Anger  ☑ Anxiety  ☑ Fear  ☑ Grief  ☐ Guilt  ☑ Chronic Fatigue

☑ Sleep Loss  ☑ Addiction  ☑ Appetite Change  ☑ Sickness

☑ Trouble Concentrating  ☑ Financial Stress  ☑ Depression

Please describe any other reactions to the crime committed.

Because of the high doses of Medications I was prescribed It had caused me every one of these issues.

UNITED STATES *v.* __Purdue Pharma L.P.__

COURT DOCKET NUMBER: __2:20-cr-01028-MCA__

VICTIM NAME: __Glenn Frederick Mckinstry f.n.a. Gregory Leonard Vincent__

## VICTIM IMPACT STATEMENT

Do you feel the defendant is or will be a threat to you, your family, or the community?

☑ Yes    ☐ No,

If yes, please explain:

I have no idea if this is a fact but I understand that Purdue Pharmasudicals has enough money to pay for harm to come to myself or family members. Note I contacted Purdue Pharmasudicals about my claim's (#7449, #15569, #65580, #75201). I included my phone number and my cell phone number and starting that day I started getting harrising phone calls and when I wrote back to Purdue Pharmacudicals to stop the prank calls they stopped that day.                                                              ✚

What else would you like the Court to know about the defendant or your situation as a result of the crime?

I had brought a complaint to CO DORA 09-21-2020 against All three Doctors at ▮▮▮▮▮ ▮▮▮▮▮▮▮ along with three Pharmacys in Wheat Ridge, CO and was told the pharmacies and the Doctors did nothing wrong. Addiction/Injusty/ disabilities dependency, reduced Pain Threshhold, Requiring BI-Pap Machine, that is Wrong.

If a victim consents, the Court may also make restitution in services in lieu of money, or make restitution to a person or organization designated by a victim. If you are interested in this option, please explain.

I have lost from November 2006 through the current time all ability to work full time because of the recovery from my addiction. All three Doctors I seen at ▮▮▮▮▮▮▮▮▮▮▮ knew I was an Alcoholic because ▮▮▮▮▮▮▮▮▮▮ Prescribed me medication for Alcoholism and yet he felt it was ok to prescrive me 6 MG Xanax, 30 MG Valium, 30 MG Flexoril, 120 MG Ridilin, 10 MG Ambien, and many other medications that should have been supervised by a Nurse and not given to a civilian.

*UNITED STATES v.* Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Glenn Frederick Mckinstry f.n.a. Gregory Leonard Vincent

## VICTIM IMPACT STATEMENT

Please list your actual financial losses from this crime. List only those items for which you have not been or do not expect to be repaid. Please attach receipts or other records that document your losses whenever possible. Please differentiate any monies already repaid by a defendant.

Loss of $50,000 a year job since 2006 to current. Loss of $50,000 a years for the rest of my life.

Have you been assessed any additional taxes, penalties, or interest by the federal government as a result of this case? If yes, please explain.

Not to my knowledge.

Have you or anyone on your behalf initiated civil action against any party as a result of this offense? If yes, please state the case name, docket number and court of jurisdiction.

Yes Sept 2020 I brought this to CO DORA and they said no Dr's or no Pharmacist, or no Pharmacies did anything wrong.

If you have suffered any other expenses as a result of this crime, please list them below. Include such items as counseling, medical bills, lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. Please be specific and attach copies of receipts if possible.

Purdue Pharmaceuticals

Overdose, Addiction/Dependence/ Substance Use Disorder, Loss of Wages/Earning Capacity, Injury/Disability including but not necessarily limited to): Cervical Dystonia, and/or Cervical Dyskinesia, and/or Cervical Neck Twitch, and/or Cervical Spasms. I was prescribed and too from 2001 or 2002 through May 2016 (14 or 15 years) the following:

Dilodid, along with other sleeping medication including and not limited to: Ambien and other sleeping medications, Benzodiazepines, (Valium and Xanax), Ritalin, Flexo rile, many other medications including Ende role (Propranolol HCL), Depakote (Valproic Acid) as well as other Codeine Based Medications which caused severe allergic reaction of severe Hives thus the use of Dila did prescribed by my Primary care Doctor's ███████████████████ ████████████████████████████████████████ of Lakewood, Colorado. It had taken me nearly 10 years now to start my recovery process from Dila did as well as all Codeine Based medications also in my claim including but not necessarily limited to:

Overdose, Addiction/Dependency/Substance  Use Disorder, loss of wages/Earning Capacity, Injury/Disability (Injury/Disability including but not necessarily limited to "Cervical Dystonia, and or Cervical Dyskinesia, and or Cervical Neck Twitch, and or Cervical Spasm. Also, Teret Like Symptoms including but not limited to Vocal noised sounding like a laugh. From the use of the medications, I was prescribed by the Dr's of ██████████████████ in Lakewood CO I was sleeping 18 hours a day. During the 18 hours of sleep my body naturally urinated a minimum of 5 or 6 times during each day urinating on myself and waking up wet. Also, from the use of my prescribed medication between 2001 – 2016 I ended up being placed on a BI-Pap machine in 2004 to keep my respiration working.  I was told I will need a Bi-Pap Machine for the rest of my life to make sure I do not die during my sleep.  My BI-Pap Machine was the only think that kept me alive during the time I was taking Medications prescribed by my Doctors at █████████ ████████████████.  I was told that my Frontal Lobe received damages to this day from my use of all Medications I was prescribed. Also, my Pain Threshold was reduced to nothing from the use of Dila did or Dila did and any or all of the many other medications I was being prescribed between 2001 – 2016.

**043**

| | |
|---|---|
| **From:** | Madalyn Marquez |
| **To:** | Victimassistance Fraud (CRM) |
| **Subject:** | [EXTERNAL] United States v. Purdue Pharma L.P., Crim. No. 2:20-cr-01028 (MCA) Victim:Madalyn Haley Marquez Status:PUBLIC |
| **Date:** | Friday, April 10, 2026 3:37:43 AM |

\*\*"PUBLIC"\*\* and \*\*"DESIRE TO SPEAK"\*\* to be eligible for the Zoom hearing on the 21st, I've included those reminders at the top.

Your Honor,

My name is Madalyn Haley Marquez. I am a mother, a daughter, a writer, and a woman who has spent the last decade fighting to reclaim a life that Purdue Pharma began dismantling before I was even an adult.

I was just a teenager when I was first handed a prescription produced by this company. At an age when I should have been focused on my future, I was being introduced to a chemical dependency that was marketed to my doctors as "safe." They didn't just sell a pill; they sold a lie that rewrote the chemistry of my brain before it was even fully developed.

Because of the path they set me on as a teenager, I face hurdles every single day. Despite my talent and my drive, I struggle to hold a traditional job or maintain a home without constant outside support. The stability that most people take for granted was stolen from me years ago, and I am still working every day to piece it back together.

In hindsight, Purdue's business model was essentially the world's deadliest "free trial." They gave us a first taste of a life-long sentence and then acted surprised when we couldn't just "opt-out" of a chemical takeover. I'd like to leave a one-star review, but the truth is, most of their other customers are already dead.

I am here today not just for myself, but for the people currently fighting for their lives in jails and institutions—people whose "criminal" records began with a legal prescription. I am speaking for the children—children like my own, ███████████—and the thousands of others who have had to watch their parents struggle in the shadows of an addiction this company manufactured. Purdue knowingly created a cycle of trauma that an entire generation of children is still paying for today.

But I refuse to let Purdue have the last word. Today, I am a content creator and an advocate. I work on the front lines promoting companies like Workit Health to help people get off the very drugs this company pushed so aggressively. While Purdue built an empire on addiction, I am building a legacy of recovery.

There is no amount of money that can return the years I lost or the friends I've buried. I am "Deliberately Disobedient" enough to have survived what they did to me, and I am here today to demand that this company finally be held accountable for the blood on its hands.

Respectfully submitted,

Madalyn Haley Marquez

**044**

**From:** Donna Mazurek
**To:** Victimassistance Fraud (CRM)
**Subject:** [EXTERNAL] Reject the Sackler's plea deal
**Date:** Wednesday, April 15, 2026 3:07:38 PM

I have 5 minutes to say how I lost a lifetime with my daughter Paige Elizabeth Mazurek!

Paige was born 7-11-92 a well rounded beautiful child would do anything for anyone she always helped anyone in need! She was our youngest of five and would make you laugh she always had her tongue sticking out she had the best personality and everyone she met loved her! She did not have an evil bone in her body unlike the people in this courtroom! The people that murdered my daughter, the people I am looking at right now yes David, Theresa and Richard out of your greed you murdered my Daughter and destroyed our family!

In February 2010 Paige went to the dentist for a root canal and was given a script for pain meds that through my deception was thought to be safe and non-addictive, then our nightmare began. Paige went in front of Judge Jodi numerous times and she told  Judge Jodi she became addicted from a root canal and was given oxy's. I found out Paige was stealing from medicine cabinets, and buying them off the

streets, she stole Scripts anything to feel normal and not go through

withdrawals. From the first script from the dentist she was now a full

blown addict, addicted to your oxycontin and anything else she could

get her hands on we were on a five year rollercoaster to save our

precious daughter from the nightmare you caused, David, Theresa

and Richard.  She pawned whatever she could get her hands on from

jewelry to our generator. Since she could no longer afford the

oxycontin on the streets her boyfriend showed her how to shoot up

heroin after she miscarried their baby due to the drugs and she could

never forgive herself! She decided to move back to Michigan with her

sisters to begin a new life away from the influences in Florida. It didn't

take long for her to get into the wrong crowd in

Michigan her sisters were searching for her during the night getting

her from drug houses and picking her up from parking lots.

She had grand mal seizures that began in florida, in Michigan she had

a psychotic episode that cut her legs, arms, sent me pictures and tried

to hang herself at her boyfriends where she was now living. He was

not an addict and tried to protect her. He wanted to marry that girl!

After that I turned everything over to God because I backed into a

brand new Cadillac so distraught from the weekend.

She had Hep C and almost lost her arm from sepsis in Florida. She

went to numerous rehabs and spent numerous times in jail. Judge

Jodi tried to help Paige, Judge Jodi sent her to CPS a rehab for thirty

days  after she completed her jail sentence. I thought I had my Paige

back but it didn't last long until she was back into the drugs. Judge

Jodi and Paige built a relationship. Since Paige's death she takes

Paige's story across the country and even to Rome one of the reasons

she left the bench was to speak, she was impacted by Paige's death!

February 28th 2015 Paige overdosed when she was stopped by the

police went to the hospital and we fought to get her into detox.

On March 30th 2015 Paige died alone in a friends bathroom and her

nightmare was over but ours will never end!

Her dad suffers with severe depression since he lost his angel!

Her sisters suffer from the loss of their best friend!
Her brother can't even hear or talk about her. It is too painful. He was her meatloaf and she was his porkchop!
I was her mamadukes and I miss her every second of every day!

Paige had dreams of being a wife, mother, designer!

She is missed by everyone; her Aunts, Uncles Cousins nieces nephews friends, sisters, brother and  Dad and Mom!

I love you more Paige and I miss you more everyday Forever 22!

The greedy evil people in this room left me with ashes and her thumbprint I wear around my neck!

Our lives have been destroyed without Paige at family gatherings, vacations, holidays.

The anniversary dates her nieces celebrate her birthday every July 11th and we hate the month of March  because she died March 30 th the week of Easter!

I often wonder how you can sleep at night with what you did and then it dawned on me. David, Theresa and Richard you have your child to kiss, hug, and hear their voice. I have none of that because you killed my daughter!

David, Theresa and Richard you will be judged one day but now you deserve to rot in jail for taking my beautiful Paige!

After confronting the Sackler's in the Purdue bankruptcy court the headlines of the New York Times was You murdered my daughter! My quote please reject their plea deal!

**045**

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮▮ |
| **To:** | Victimassistance Fraud (CRM) |
| **Subject:** | [EXTERNAL] Purdue Pharma Victim Impact Statement: Lucian Reyes-McCallister victim of Nitazene poisoning |
| **Date:** | Wednesday, April 15, 2026 12:40:36 PM |

Good morning,

My name is Grey McCallister de Reyes. I am writing on behalf of my son, Lucian "Lucci" Reyes-McCallister, who died January 26th, 2025, from Nitazene poisoning. This is my PUBLIC victim impact statement in honor of Lucci, who was twenty-two at the time of his passing. I would like to be considered to provide an ORAL statement at the sentencing hearing. As a mother, I prayed I would never suffer the agonizing loss of a child. As a professional who spent the majority of her career in the pharmaceutical industry, I never fathomed that loss would be a result of the reckless and criminal negligence of a pharmaceutical company.

Lucci was introduced to synthetic opioids in high school, almost twenty-five years after the FDA's approval of OxyContin. As a nation, we were battling the third wave of the opioid epidemic, at a time when synthetic opioids were being distributed less by Rx pill mills and increasingly by illegal pill presses. Lucci, like many of his peers and generations before him, wanted to emulate the experiences of his favorite artists. Only instead of sex, alcohol, and marijuana, this generation's idols rapped and sang about synthetic opioids. Pills were easy to access, convenient to hide, and cheap to buy.

Mental and physical addiction took hold quickly, and by Lucci's senior year of high school, Fentanyl had gained a stronghold in Houston's illicit pill supply. Lucci soon lost one of his best friends. Tragically, more kids followed. I began to say that our youth were losing peers in numbers not seen outside of war times, as attendance at funerals and memorials became a normal rite of passage for teens. But it wasn't just Lucci's friend group. The artists he admired and emulated were dying, too. Lil Peep. Mac Miller. Juice WRLD. Lucci entered rehab two months after his eighteenth birthday. He fought for his sobriety until his death. And his new favorite artists? Well, they became artists such as Jack Kays and Steven Moses. Artists who documented their own devastating losses due to opioid addiction and their journeys toward recovery.

Lucci used to say, "I just need to make it one second, and after 60 seconds, I'll have made it one minute. And then, one minute eventually becomes five minutes, ten minutes, and an hour. And when I've reached twenty-four hours, I'll have made it one whole day." That is the devastating hold synthetic opioids had on Lucci's life. That is the devastating impact this epidemic has had on our society, an epidemic created by Purdue Pharma out of greed and fraudulent marketing.

My son was a talented tattoo artist, mechanic, and had just begun a position restoring airplanes when he passed. He was navigating an intensely difficult personal situation and slipped, reaching for his long-time nemesis, street Xanax. What he purchased was, in fact, N-Pyrrolidino Protonitazene -- a synthetic opioid twenty-five times more deadly than Fentanyl. The substance was only caught due to outside lab testing, as his original toxicology reports contained nothing more than alcohol. These new additions to the cartel's arsenal make OxyContin seem like child's play. Nitazenes, alone, can range up to forty times more deadly than Fentanyl. The synthetic opioid epidemic is raging at such an unprecedented rate. While

we are currently praising a reduction in Fentanyl deaths, much deadlier opioids are entering the illicit drug supply, slipping by toxicology panels undetected. Worse, opioid antagonists, our one tool in reversing poisonings, are proving ineffective -- often requiring multiple rounds of Naloxone to revive a victim.

But perhaps the greatest injustice is that this epidemic has been raging for so long that society has grown numb to the loss of life. Our children's deaths are deemed another senseless tragedy rather than a prosecutable crime. Support groups and online forums are filled with families seeking justice for their children in court systems and law enforcement agencies overrun with cases. Our children's addictions are criminalized and prosecutable, but their deaths are chalked up to senseless tragedies. To be clear, these children, families, and our communities are victims of very real crimes, in a death march created by the Sackler family and Purdue Pharma. I ask that the court reject Purdue Pharma's plea deal.

 As a society, we may not have the answers on how to end this epidemic. But we most certainly know where, when, and by whom it was started.

Thank you for considering my testimony.

Grey McCallister de Reyes

**046**

April 12, 2026

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

| |
|---|
| **In re:** |
| **UNITED STATES** |
| **v.** |
| **PURDUE PHARMA L.P.,** |

Case No. **2:20-cr-01028-MCA**

**VICTIM IMPACT STATEMENT**

Honorable Judge Madeline Cox Arleo,

My name is **Carrie L McGaha**, and I stand before this Court as a direct victim of the system that enabled the crimes to which the defendants have now pleaded guilty—violations of the Food, Drug, and Cosmetic Act and conspiracy to violate the Federal Anti-Kickback Statute.

These are not abstract legal violations. They are the foundation of a system that altered the course of my life, my children's lives—and the lives of countless others—through deception, policy manipulation, and profit-driven decision-making that ignored human consequences.

I was prescribed opioids legally, under medical supervision, as part of what was presented to me as appropriate and accepted medical care. I did not abuse the system. I trusted it. And that trust cost me my health, my stability, and deeply impacted my family.

But I am here today not only to speak about what was done to me—I've established some of that in previous pleadings to the Court in the Purdue Pharma case.
I am here to speak about what is still being done as a result of what was done by Purdue Pharma and enabled by every agency charged with their oversight.

**THE SYSTEMIC HARM**

The harm caused by Purdue Pharma did not occur in isolation. It was enabled—sustained—by a broader system of governmental agencies, corporate actors, healthcare institutions, insurance industry and policy-makers who adopted and enforced the very practices that made this crisis possible.

The crimes before this Court were not just violations of law.
They were violations of **duty, trust, and truth**.

And while accountability is being addressed in part through this sentencing, the **full impact of that system has not been corrected**.  The Courts and Status Quo Systems have NOT seriously considered the lived experience and lessons learned by anyone except those who dealt with victims who caused a Public Nuisance.

**A NEW CLASS OF VICTIMS**

As a result of these crimes—and the sweeping legal and policy responses that followed—**a New Class of Victims is now being created**.

These are individuals:

- With legitimate, documented pain conditions;

- Who have not abused their medications;

- Who relied on appropriate medical care;

- And who are now being **denied adequate pain treatment**.

In response to the opioid crisis, policies have shifted from over-prescription to **fear-driven under-treatment**. Physicians are pressured. Patients are stigmatized. Access is restricted—not based on individual need, but on institutional liability concerns.

The result is profound:

Patients who did nothing wrong are now:

- Left in unmanaged, debilitating pain;

- Cut off from medications that once allowed them to function;

- Treated as risks instead of human beings;

- And forced to suffer in silence.

This is not a correction of injustice.

It is the continuation of it—just in a different form.

## UNINTENDED CONSEQUENCES—REAL HARM

Opioids, when properly prescribed and monitored, **are a legitimate and necessary medical tool**. The problem was never the existence of the medication—it was the **fraudulent promotion, misrepresentation, and systemic enablement** of its misuse.

But instead of correcting those failures with precision and integrity, the response has been broad, reactionary, and harmful.

The effective result of these prosecutions and settlements—across this case and others pursued by State Attorneys General and institutional actors—has been:

- The erosion of physician discretion;

- The abandonment of legitimate pain patients;

- And the normalization of suffering for those who depend on proper medical treatment.

## FAILURE TO RECOGNIZE THIS CLASS OF VICTIMS

By failing to recognize and address this growing CLASS of VICTIMS, this process risks doing something deeply troubling:

It **indemnifies their mistreatment** and increases the legitimate **FEAR** of untreated pain, which directly increases the pain that patients experience by increasing their resulting anxiety. It is causing increased Harm to law-abiding citizens by ignoring the legitimate need for adequate pain relief of legitimate pain patients.

It sends a message that:

- If you were harmed by overexposure, you are a victim;

- But if you are now harmed by denial of care, you are invisible.

That is not justice. That is an imbalance.

## WHAT JUSTICE REQUIRES

Justice in this case must go beyond punishment.

It must include **recognition of the full scope of harm—past and present**.

I respectfully ask this Court to consider:

- That victims exist on both sides of this crisis;

- That those who followed the rules should not now be punished for the system's failure;

- And that any resolution that ignores this reality allows harm to continue under a different name, abatement.

- And it has caused the complete destruction of the **Public Trust** in our Healthcare System and the institutions in government meant to regulate them, for the Public Benefit.

I recognize that this hearing is to determine the sentence of Purdue Pharma for the felonies to which it has pleaded guilty. However, it must not go unacknowledged that these crimes did not occur in isolation. They were enabled by the very same governmental and corporate actors entrusted to regulate, oversee, and safeguard the public. Those who failed to prevent these violations are now positioned as the architects of the solution to the opioid crisis. Yet, in doing so, many have shifted from one form of systemic harm to another—creating policies and practices that inflict widespread suffering on legitimate pain patients. If this broader system is not recognized and corrected, it risks perpetuating a new form of abuse—one that may prove as damaging, if not more so, than the conduct for which Purdue Pharma now stands before this Court.  They are enlarging the Class of Victims that were effectively ignored in the mediation of the Purdue Pharma case.

## CLOSING

Your Honor, I trusted the system—and it failed me, repeatedly.

Today, I ask this Court to impose a sentence on Purdue Pharma that reflects the full weight and seriousness of the felonies to which it has pleaded guilty. Accountability must be real, and it must be meaningful.

But justice cannot stop there.

The harm caused in this case was not created by one company alone. It was enabled, reinforced, and sustained by governmental and institutional actors who had both the authority and the responsibility to prevent it. Those same entities now stand in positions of power to shape the response to this crisis—yet many are perpetuating new forms of harm against legitimate pain patients.

If true justice is to be served, accountability must extend beyond the defendants before the Court. Those who E**nabled** these crimes must also be held responsible for their role in the harm that followed. And just as importantly, they must be required to **reduce harm going forward**—by restoring balance, protecting legitimate patients, and ensuring that policies do not continue to inflict suffering under the guise of reform.

Do not let this moment become a partial measure of justice.

Hold the guilty accountable—fully.
Recognize the system that allowed it and hold them accountable.
And ensure that the path forward does not create new victims in the name of correcting past wrongs.

I am electing to make my statement Public and I would like to speak at the hearing being held on April 21, 2026.

**Respectfully submitted,**
Carrie L McGaha

047

My name is Lisa Miller. I am 59 years old. I was involved in an automobile accident in December 1999 that left me with C-3 -C-7 fused in my neck… Literally, a titanium plate &12 screws in the back of my neck. I was introduced to Dr. ███████ at Ampla hospital in Chico, California in approximately 2010. This doctor started me out on Opiates. Very quickly he transitioned me to stronger opiates. By the time I finally took it upon myself to seek professional help I was a mess. I have been through Aegis opiate rehabilitation center multiple times but I just kept relapsing. I finally took it upon myself to get on Suboxone which makes it impossible to take any type of opiate without getting deathly ill. Due to all the years of abuse I have permanent digestive issues, heart issues, renal issues & needless to say psychological issues. I would be dead if I would not have gotten myself on Suboxone. But now after years of being on Suboxone I have lost half my teeth & cannot even chew food to be able to eat right. I am only still alive by the grace of God but my life is forever changed. I do hope that someday these people that produced this drug are somehow able to empathize with the people who's lives have been ruined due to taking this drug.

There is one last impact that I need to add to my impact statement. I had a fiancé whom I had been with for almost 5 years. Due to the multiple health issues & the physical appearance in which I have suffered due to the loss of over half my teeth & the extremely severe case of chronic receding gums due to the fact that I wanted to get off the opiates & the ONLY thing that would guarantee that fact was for myself to take Suboxone. I have lost so much due to the severe opioid addiction, before I got addicted to opioids that were prescribed to myself I have lost my dignity, the love of my life & as I already stated my life will be forever affected in multiple negative ways. The only thing I have left is my faith in God.

Sincerely, Lisa Miller.

**048**

**From:** Rhonda Miller
**To:** Victimassistance Fraud (CRM)
**Subject:** [EXTERNAL] Rhonda Kay Miller
**Date:** Saturday, April 11, 2026 9:53:51 AM

---

I would love to say what this drug has done to me and my life. I have been on oxycodone for over 15 years and my body hurts from back pain, discs that are out of place, major siatica pain every single day and night. I had no idea when prescribed oxy that it was addictive and you would be deathly sick if you run out. The pain is bad but running out of this medication is the worst thing a person can go through. I'm 69 years old and withdrawal from this medication will kill me or make me want to kill myself! I'm only here because or my grandkids or I would have offed myself a long time ago. I need this medication and running out is deathly! I would NEVER Ever
took this had I know how addicting it was!
I have not one dime saved for emergencies because of this drug! It has cost me a fortune to keep myself going. The makers of the drug should have been more up front about this medication and it's addictive properties so adults could have made a more informative decision on whether they wanted to take it or not.
I wish I had never been prescribed this!

Respectfully submitted,
Rhonda Kay Miller

Get Outlook for iOS

**051**

| From: | Lisovicz, Edan |
| --- | --- |
| To: | McGuire, Maryann N (CRM); Victimassistance Fraud (CRM) |
| Cc: | lynette20639@gmail.com; Preis, Arik |
| Subject: | [EXTERNAL] United States v. Purdue Pharma L.P. – Victim Impact Statement (Lynette Naimi-Ezami) |
| Date: | Tuesday, April 14, 2026 12:15:43 PM |

Ms. McGuire –

We have been in communication with Lynette Naimi-Ezami, who asked that we submit the below victim impact statement on her behalf. She has confirmed she would like her statement to be publicly accessible. Ms. Naimi-Ezami is copied on this email.

Thank you,
Edan

\*\*\*


Lynette Naimi-Ezami

████████████████████████████████

**Victim Impact Statement**

My son's life began with hope, with dreams, with all the possibilities a parent imagines for their child. In 2009, opioids entered his world, and slowly, painfully, they began to take pieces of him away. By July 3rd, 2018, they took everything.

He was 31 years old — still young, still growing, still trying. Addiction did not define him. He was gentle, funny, stubborn, and full of heart. He was someone who deserved help, compassion, and a chance to recover. Instead, he became another life lost to a crisis that has taken far too many.

Since his death, my world has been quieter, emptier. There is a chair he will never sit in again, a phone call that will never come, a future that will never unfold. Grief has become a companion I never asked for and cannot put down.

I am writing this statement today because his story deserves to be heard. His life mattered. His death matters. And the impact of losing him is something I carry every day — in my heart, in my home, and in the silence where his voice should still be. He had a 4-year-old daughter who grew up not knowing her father. She only has vague memories. Thank you.


Edan Lisovicz
**Akin**



| akingump.com | Bio

This email message was sent from Akin Gump Strauss Hauer & Feld LLP. The information contained in this e-mail message is intended only for the personal and confidential use of the

Case 2:20-cr-01028-MCA    Document 35-1    Filed 04/21/26    Page 183 of 206 PageID: 792

recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message

**055**

Judge Madeline Cox Arleo

U.S. District Court for the District of New Jersey

Martin Luther King Building & U.S. Courthouse

50 Walnut Street

Newark, NJ 07102


U.S. Department of Justice

Criminal Division, Fraud Section

10th & Constitution Avenue, NW

Bond Building, 4th Floor

Washington, DC 20530

Via email: victimassistance.fraud@usdoj.gov


April 15, 2026


To the Court and the United States Attorney's Office:

I urge the Court to **reject this plea agreement,** and I urge prosecutors to pursue real accountability. What is before the Court is not justice. It is a grotesque distortion of justice. It is a historic and morally bankrupt response to one of the greatest public health disasters in modern American history. It asks this Court to ratify institutional cowardice, the protection of power in the face of mass death, and a system in which catastrophic harm is reduced to paperwork, percentages, and payment schedules designed by elite law firms. History will remember whether this Court stood with the victims who seek truth and accountability, or chose expedience over justice.

I submit this Victim Impact Statement as a bereaved mother, but also as someone profoundly betrayed by the very systems and regulatory agencies I was raised to trust. I believed in following the rules, in personal responsibility, and in the promise that if you lived honestly and did what was expected of you, your family would be protected. Instead, the price of that faith was the death of my beautiful son, betrayal by that system, a lifetime of relentless grief, and the pain of watching my mother deteriorate as a direct result of Purdue's actions.

Purdue pleaded guilty to serious felony charges, yet this plea agreement reduces mass harm to money, procedure, and delay. A crisis created by greed will not be resolved through fines alone, especially when the people most responsible are allowed to escape meaningful accountability. If financial punishment is all our system demands for wrongdoing on this scale, then it sends a chilling message: that justice is harsh for the powerless and optional for the powerful. No payment schedule can restore the lives that were lost, repair the families that were shattered, or heal the civic and moral injury caused when ordinary people are forced to endure consequences that powerful actors are permitted to avoid. This is a profoundly inadequate resolution to one of the greatest public health disasters in modern American history.

My son's introduction to opioid use began in his grandmother's medicine cabinet because OxyContin was being so freely prescribed. At one point, she was being prescribed six different opioids and had become completely dependent. Then, like so many patients who had become physically dependent after years of medical exposure, she was cut off without a safe, humane plan for what came next. The government helped create the dependence crisis by allowing opioids to saturate the country for years, and then failed to build a responsible off-ramp for the people who had been made dependent. That failure pushed many patients into desperation and, too often, into the illicit market to alleviate their pain.

My generation could experiment and still find their way back because opioids were not woven into everyday life this way. My son grew up in a different world. By the time he came of age, opioids were everywhere; they were normalized because this company normalized and aggressively marketed them. He was not stepping into the same risks my generation faced. He was coming of age in a landscape already shaped by saturation, dependency, and institutional neglect.

When he needed help, it was nearly impossible to find. What passes for treatment in this country continues to fail far too many people with opioid use disorder. People are cycled through abstinence-based programs, short stays, discharge, relapse, and renewed danger, each round deepening hopelessness. They are not failing; the system is. We continue to send people with opioid use disorder into treatment models largely built for alcohol, despite the very different realities of opioid dependence. Yale researchers found that people with opioid use disorder who

received non-medication, abstinence-based treatment were more likely to die of overdose in the following months than those who received no treatment at all. And yet these are the kinds of approaches that continue to receive support and funding.

And the loss does not end with death. It continues every day. I still avoid sleep because morning is often the cruelest moment: I wake up, and for a split second there is a world in which he is still here, and then I remember he is gone. That realization lands again and again, every single day as if it's the first time I learned he was gone. A mother cannot reconcile the loss of her child in any ordinary sense. It is not simply grief; it's a primal injustice. It is a permanent rupture in the order of the world. Yet bereavement services for families like ours are few and far between, because the stigma follows us even in mourning. We did not have casseroles brought by sympathetic neighbors or the kind of support other grieving families often receive. Too often, we are treated as though our children deserved to die, and we are left to grieve in isolation.

This case also cannot be understood apart from the broader collapse of federal oversight. Purdue admitted that it misled the DEA about its anti-diversion efforts while continuing to market opioids to prescribers it had reason to believe were diverting them, and that it submitted misleading prescription data to support higher manufacturing quotas. In other words, the very system meant to regulate supply was fed distorted data by the company it was supposed to restrain. Congress then further tied DEA's hands through the 2016 Ensuring Patient Access and Effective Drug Enforcement Act, which added a Corrective Action Plan process and heightened the standard for immediate suspension orders, a change described by former DEA Chief Administrative Law Judge John Mulrooney as a "dramatic diminution" of DEA's authority.

At the same time, the federal government had already resolved serious misconduct by a Purdue affiliate in 2007, including false marketing of OxyContin as less addictive and less likely to cause dependence and withdrawal, and Purdue entered into a five-year Corporate Integrity Agreement with HHS-OIG that ended in 2013. Yet the conduct at issue here continued well beyond that point. That history shows that regulatory failure was part of the architecture that allowed this crisis to deepen, and that the sentences imposed on these unethical companies were ineffective.

None of that relieves Purdue of responsibility. If anything, it makes accountability more urgent. Where agencies failed to protect the public, the criminal court should be especially careful not to ratify a resolution that again substitutes process, payment, and institutional closure for meaningful justice.

The criminal plea cannot be separated from the bankruptcy structure that shaped and softened it.

**This Case Never Belonged in Bankruptcy Court**

You will hear that the bankruptcy was confirmed with overwhelming support, including repeated claims that more than 99% of voting creditors supported the plan. But that statistic is highly misleading. Multiple issues on appeal go directly to whether the plan complies with *Harrington v. Purdue Pharma*, due process, Article III, and the Bankruptcy Code itself. Those issues include whether the plan imposes de facto nonconsensual third-party releases on personal-injury claimants, whether payment was conditioned in a coercive way that undermines any claim of valid consent, whether the supposed "litigation option" for non-releasing claimants is illusory, whether the channeling injunction improperly bars direct claims against the Sacklers, whether claimants voted on materially incomplete or outdated disclosures, and whether votes from claimants later deemed deficient or ineligible were counted to manufacture support.

**Section 11.1(f)** is especially troubling because it appears to preserve a mechanism by which a protected party can return to the bankruptcy court and argue that a later lawsuit is really an "Estate Cause of Action" that must be stopped. In practical terms, that means the plan may create a procedural device to drag those claims back into bankruptcy court and seek their dismissal. That is difficult to square with the Supreme Court's holding in *Harrington* that bankruptcy courts may not use Chapter 11 to impose nonconsensual releases of claims against nondebtors. At a minimum, it raises a serious question whether the revised plan recreates, in functional terms, the very protection the Supreme Court said bankruptcy law does not authorize. That same concern is reflected in the pending appellate issues, which expressly challenge whether the plan extinguishes direct tort claims regardless of consent, whether the channeling injunction unlawfully bars present and future victims from asserting direct claims, and whether the plan's post-solicitation modifications and evidentiary changes required resolicitation.

The agreement calls for Purdue to be dissolved and emerge as a public benefit corporation, yet there is no evidence that the emerging Knoa Pharma will meaningfully benefit the public simply because it has a new name or carries the language of public benefit. If there is to be any legitimate path forward, it should be built around victim-led oversight, public accountability, transparency, and real repair. A true public-benefit structure would acknowledge, respect, and center the people most harmed. It would invest in solutions that actually reflect the scale and nature of this crisis, including better treatment models, proper aftercare, long-term support, and use of its assets for the development of breakthrough therapies like ibogaine in the public domain.

Claimants were asked to vote on this plan without any guaranteed individual recovery. The plan did not promise a specific dollar amount to any personal-injury claimant. Instead, claimants were asked to vote based on potential ranges, assumptions, and post-confirmation decisions, even though earlier disclosure materials had provided clearer payout estimates, and flexible evidentiary standards.

That uncertainty became even more troubling as the post-confirmation process unfolded, when some claimants learned only after the plan vote that their claims were considered deficient, that additional documentation was required, or that they might not be eligible for payment at all. In other words, some people cast votes believing they would be compensated, only to be told later that they may receive nothing.

That defect goes to the fairness and reliability of the solicitation itself. The issues now on appeal expressly include whether claimants voted based on outdated or materially incomplete disclosures, whether payment conditions changed after solicitation, and whether counting "yes" votes from claimants later deemed deficient or ineligible rendered the vote unreliable.

The evidentiary burden also falls heavily on personal-injury claimants, but not on governmental entities who are receiving the majority of the funds. The appellate issues expressly challenge that unequal treatment. It is not fair in practice to require people, years later, to assemble proof of opioid exposure, treatment, injury, and death in a system where medical records are often unavailable. The debtors' own objection emphasizes that claimants could lose the prima facie

validity of their claims if they failed to attach supporting documentation, and the January 2026 claims objection sought to disallow and expunge certain claims on that basis.

Most disturbing of all, death itself does not meaningfully drive recovery under the plan. For Non-NAS personal-injury claims, the central distinction is not whether a person died or how catastrophic the family's loss has been, but whether there was qualifying opioid use for more or less than six months. To ignore the gravity of wrongful death in order to process claims administratively shows how much our losses are valued. This is not surprising, considering we've been told funeral expenses are not an approved abatement strategy.

The professional-fee structure in this case should also give the Court pause. This process guaranteed extraordinary compensation to lawyers, consultants, and investment bankers while leaving personal-injury claimants uncertain about what, if anything, they would recover. Court records show partner billing rates as high as $2,645 per hour for Davis Polk and $2,495 per hour for Akin Gump. At the same time, investment bankers were paid on what amounts to a standing monthly retainer basis: PJT Partners and Jefferies have received $225,000 per month, and Houlihan Lokey received $200,000 per month, regardless of the amount of time they invested. The underlying time records show those retainers translated at times into effective hourly rates in the range of $5,000 per hour, which underscores the point: the case rewarded institutional intermediaries on terms no ordinary victim could ever hope to negotiate. These fees have now exceeded $1 billion.

What is even more troubling is where this money comes from. The plan materials state that money transferred into the **Personal Injury Trust** is used first to pay trust administration costs, trustee and professional fees, and certain claimant attorney fees, with victims receiving only what remains afterward. The same materials state that claimant attorneys may be paid directly from PI Trust funds and that claimants' votes were treated as consent to those fee structures, even though many claimants were never separately asked to approve them in any meaningful, informed way, and some attorneys even voted on the claimant's behalf.

Nor is this an isolated feature of Purdue. The same opioid-litigation ecosystem has already extracted substantial sums from other opioid settlement structures. In Pennsylvania alone, a Special Master recommended reimbursement of $16,651,314.53 in contract attorney and other

eligible costs from opioid settlement funds, including $12,582,565.32 in contract attorney costs and $4,068,749.21 in other costs. This pattern shows that Purdue is not a one-off aberration, but part of a broader model in which mass opioid resolutions generate extraordinary professional compensation while victims continue to have GoFundMe's to bury their children.

This Court should not ignore the reality that, in this case and others like it, opioid "resolution" has too often become an opportunity not only for lawyers, but for a broader network of financial and institutional actors to profit through fee structures, advisory roles, and funding arrangements, while the individuals actually harmed are excluded from every meaningful phase of the process.

For years, victims have been told that this is the best possible outcome because Purdue's money is supposedly needed to abate the crisis. But that narrative no longer holds. We now have years of evidence showing what happens when opioid settlement money is routed back through the same institutions that failed victims in the first place. These settlements generate press releases, political talking points, and declarations of progress, but they have yet to generate accountability, meaningful repair, or the kind of systemic change that would actually prevent more loss.

Pennsylvania is a clear example. The state's own opioid settlement dashboard shows **$246,978,188** received in the December 2024 distribution and **$143,056,368** received as of December 2023, yet only **$83,655,836** had been spent and **$52,000,147** committed. That means hundreds of millions of dollars were already in the system, while only a comparatively small portion had actually been put to work. And still, Pennsylvania is expected to receive about **$212 million** more from the Purdue settlement. There is no urgent unmet governmental need so compelling that justice must be traded away. It's perfectly clear to me that institutions receiving these funds are not acting with the urgency, transparency, or fidelity we were promised.



Source: https://www.paopioidsettlementdata.org/

The contradiction runs even deeper. Prosecutors have argued that Purdue helped create a population of victims, yet governments continue to use opioid settlement funds in ways that support punitive measures. Which is it? Are these individuals victims, or are they criminals? A system that calls them victims when collecting money and treats them as criminals when spending it has lost any claim to moral consistency. In Bucks County, PA the Public Defender's Office recently told the Pennsylvania Opioid Misuse and Addiction Abatement Trust that **99% of its clients have OUD** or another SUD or mental health condition[1], underscoring how often people needing care are met with punishment.

And what of the families left behind? Our own research shows that only **2%** of families have received any help from opioid settlement funds. 43% reported stopping work after the loss of a loved one, 80% said the loss affected their retirement plans, 74% faced financial barriers to funeral services, 30% reported being terminated by their employer for grieving, 5% lost their homes, and 5% reported a bankruptcy. That is what the families most harmed are carrying in addition to unfathomable grief, while we watch opioid settlement dollars be misspent and know that we do not even have standing to challenge those decisions in court, or the institutional access needed to compete for those funds ourselves, whether to cover funeral expenses, get a grieving mother to work, or buy a winter coat for a child being raised by his grieving grandmother after both of his parents have died and she has already exhausted her retirement trying to care for them.

That is why the "we need the money now" argument no longer carries the moral force it once did. Yes, resources are needed. But more than money, we need honesty about what failed, accountability for those who caused this harm, and structural reform that prevents it from happening again. Governments should not continue to be treated as the principal injured parties while directly harmed individuals and grieving families are pushed aside. No amount of money can bring our children back, and we did not enter this process because we believed it could. We entered it because prosecutors and attorneys general told us these funds would be used to abate the crisis and spare other families from the pain we carry. That is what drives us. We have suffered a primal injustice that goes far deeper than any court could ever remedy, and it compels

---

[1] https://www.paopioidtrust.org/getmedia/1c1d82f7-0511-4fe3-8d48-4d52021a2bc9/20251112-DRC-Meeting-Minutes.pdf, you tube version can be viewed here.

us to do everything in our power to prevent more unnecessary loss of life. For many bereaved mothers, this grief becomes a duty: to tell the truth, to protect life, and to help transform the systems, values, and institutions that allowed this devastation to happen.

If this plea is accepted, the lesson to every powerful corporation and executive in America will be clear: cause catastrophic harm, negotiate long enough, move enough money through enough channels, and you are free to continue to operate without consequences and supply medications to Americans. That precedent would do enormous damage to already questionable trust in the justice system.

This Court is not being asked to solve the opioid crisis. The larger work of repair will fall to those of us who have buried our children and who continue, every day, to fight to save others. The Court is being asked whether this particular plea agreement is a lawful and just criminal resolution to one of the greatest public health disasters in modern American history. **It is not.**

I ask this Court to reject the plea agreement, and to direct the United States Attorney's Office and the Department of Justice to meet directly with bereaved families before pursuing any further resolution in this case. We are the people who understand most clearly what is needed. We have lived the consequences, we have viable solutions to offer, and our commitment to preventing further loss cannot be questioned.

My son Tyler was an extraordinary human being who should still be here. I expect that for the rest of my life I will wake each day into that agony. But I will also rise each day and fight for real justice, because he deserved better, and so does every person still suffering.

I ask this Court to reject this plea and stand on the right side of history by affirming that **justice in this country cannot be bought, negotiated away, or buried in process.**

Sincerely,

Susan Ousterman, Bensalem, PA

Mobile:

# 056

| | |
|---|---|
| **From:** | Lisa Patrick |
| **To:** | Victimassistance Fraud (CRM) |
| **Subject:** | [EXTERNAL] My son Patrick Hunyadi |
| **Date:** | Tuesday, April 14, 2026 1:33:56 PM |

Hello,

I would like to add to the hearing and let you know about my son, Patrick.  He was 23 years old when he died because of fentanyl poisoning.   He had a bad car accident when he was 20 years old.  From that he was taking OxyContin medication for his back pain.  This was in 2000 or around that time.  He died in 2004.  He became addicted to OxyContin medication.   His doctor eventually told him he could not prescribe that drug to him anymore.   He begged the doctor because of his pain and at that time is addition to OxyContin.   Because the doctor would not proscribe OxyContin anymore my son, Patrick went to find something on the street.  Somehow he got ahold of fentanyl through friends.  I believe if he had not been prescribed the OxyContin he would not have become addicted.   I live with this grief of my son's death every day.   It is horrible and because of this company telling doctors miss information about a drug it created a public health crisis.   If you need additional information from me please let me know.

Lisa Patrick

Sent from my iPhone

**059**

United States v. Purdue Pharma LP

Court Docket # 2:20-cr-01028-MCA

Victim Name: Vitaly Pinkusov,
Executor to the Estate of Elina Goldovsky

☑ I want my Statement to be PUBLIC.

☑ I would like to be considered to provide an oral statement at the sentence hearing on April 21, 2026.

I. Crime and its effect on my family.
My name is Vitaly Pinkusov. My wife, Elina Goldovsky, died because of Opioid Addiction. My family got destroyed because of Purdue Pharma's crime. My health has suffered and it will never be the same.

II. Counseling as a result of this Crime.
I have received counseling following the death of my wife.

III. Defendant's Contribution to my wife's Opioid Addiction.

I strongly believe that Purdue Pharma has contributed to my wife's Opioid Addiction through its efforts to fraudulently conceal Oxycontin's addictive qualities. The exhaustive Investigation has confirmed that. I will never know who was the Last Prescriber of Oxycontin that my wife has taken, I do know that Purdue Pharma has gotten this devious product on the market and facilitated the delivery of it to our home on December 19, 2007, And Oxycontin contributed to Elina's demise.

IV. Experience following the Crime.

I have suffered through anger, anxiety, guilt, grief, sleep loss, sickness, financial stress and depression.

I have suffered from nightmares where we are surviving multiple car crashes and then Elina dies in her own bed.

V. Threat to Community/Communities

Purdue Pharma continues to be a constant threat to the Communities. People continue to die.

2

VI. Additional Information.

I have filed Claims against Purdue Pharma in the United States Bankruptcy Court for the Southern District of New York. That case is coming to an End in the next 60 days or so. Finality is very important. And I hope that this seemingly neverending matter will end and Purdue Pharma will become a company that has been judged and adjudicated.

VII. Actual Financial Losses./Incidental Losses/.
There are no Actual Financial Losses. Because they are priceless. There is no Price on Human Life. Not now, not ever.

VIII. Final Thoughts.
This Court will be the only Court that passed a criminal judgement on a criminal company.

3

***UNITED STATES v.*** Purdue Pharma L.P.

**COURT DOCKET NUMBER:** 2:20-cr-01028-MCA

VICTIM NAME: Vitaly Pinkusov (on behalf of the Estate of Eline Goldovsky)

**Please select one of the following as it relates to your statement that follows:**

[ ] I want my statement to be PRIVATE (only accessible to the court, the government, and the defendant)

[✓] I want my statement to be PUBLIC (made publicly available on the court docket)

**I would like to be <u>considered</u> to provide an oral statement at the sentencing hearing on April 21, 2026:**

[✓] Yes

[ ] No

➤ Please note the court has advised that anyone who wishes to make an oral statement <u>must</u> elect to have their statement made public. In addition, the court has determined that it will allow a limited number of individuals to speak at the sentencing hearing. If you are selected to provide an oral statement, you will be informed in advance.

5

**060**

UNITED STATES v. **Purdue Pharma L.P.**

COURT DOCKET NUMBER: 2:20-cr-01028-MCA

VICTIM NAME: **Frederica Roberson**

**Please select one of the following as it relates to your statement that follows:**

☐ I want my statement to be PRIVATE (only accessible to the court, the government, and the defendant)

☑ I want my statement to be PUBLIC (made publicly available on the court docket)

**I would like to be <u>considered</u> to provide an oral statement at the sentencing hearing on April 21, 2026:**

☑ Yes

☐ No

➢ Please note the court has advised that anyone who wishes to make an oral statement <u>must</u> elect to have their statement made public. In addition, the court has determined that it will allow a limited number of individuals to speak at the sentencing hearing. If you are selected to provide an oral statement, you will be informed in advance.

How have you and members of your family been affected by this crime? Feel free to discuss how the crime has affected you and/or your family's health and lifestyle.

My name is Frederica Roberson, and I am the mother of Marquavies Bernard Broughton, who passed away at the age of 21 from a nitazene overdose.

Years before his passing, my son was prescribed opioid medication for football-related injuries. At the time, it did not appear to be a problem. We trusted the medical system and believed he was being given something safe to help manage pain.

However, over time, that early exposure led to a dependency. What started as a prescription eventually turned into him seeking out opioids on his own. As access to prescription medications became limited, he began obtaining substances from the street—where the drugs are far more dangerous and unpredictable. That path ultimately led to his exposure to synthetic substances like nitazenes, which took his life.

The loss of my son has changed every part of my life. No mother should ever have to bury her child. The pain is indescribable—it is a grief that does not go away, only something you learn to carry. My family has been deeply affected emotionally, mentally, and spiritually. Holidays, birthdays, and everyday moments are no longer the same.

Have you and/or members of your family received counseling as a result of this crime?

Yes

If yes, please explain:

Grief counseling and emotional support have been necessary to cope with the trauma of losing my son. I have experienced anxiety, depression, and ongoing emotional distress that affects my daily life.

If you and/or a family member were a patient of the defendant, did you and/or the family member express any concerns to the defendant in relation to the charged conduct?

No

Do you believe the defendant began or contributed to you and/or your family member's addiction?

Yes

If yes, please explain:

My son's introduction to opioids began with a legitimate prescription for a sports injury. While it may not have seemed harmful at the time, that exposure played a role in his later dependency.

The widespread prescribing of opioids—driven in part by pharmaceutical companies minimizing the risks—created an environment where these medications were normalized. This contributed to a pathway where individuals like my son later sought out opioids beyond medical use, eventually leading to more dangerous substances on the street.

Did the defendant prescribe or dispense drugs that resulted in death or bodily injury?

Yes

If yes, please explain:

While Purdue Pharma did not directly provide the substance that caused my son's death, their role in fueling the opioid epidemic contributed to the conditions that led to it. The transition from prescription opioids to illicit and synthetic drugs is a direct consequence of this crisis.

Do you believe the defendant failed to provide necessary care?

Yes

If yes, please explain:

There was a failure to fully inform patients and families about the risks of opioid addiction. Had we known the long-term dangers, we may have made different decisions. That lack of transparency has cost families like mine everything.

Did the defendant bill you and/or your family member's health insurance for unnecessary procedures or procedures that were never performed?

No

Have you experienced any of the following reactions to the crime:

**Anger Anxiety Fear Grief Guilt Chronic Fatigue**

**Sleep Loss** Addiction **Appetite Change** Sickness

**Trouble Concentrating Financial Stress Depression**

Do you feel the defendant is or will be a threat to you, your family, or the community?

Yes

If yes, please explain:

The impact of the opioid epidemic continues to affect communities across this country. Even today, we are seeing the consequences through rising overdoses and the spread of even more dangerous synthetic drugs like nitazenes.

What else would you like the Court to know about the defendant or your situation as a result of the crime?

My son's life mattered. He was more than a statistic. He was loved, he had purpose, and he deserved a future.

Since his passing, I have founded The Marquavies Bernard Broughton Foundation to raise awareness, educate communities, and help save lives. I am doing everything I can to make sure his story brings change.

I ask the Court to recognize the full human impact of this crisis—not just the legal consequences, but the lives lost, the families shattered, and the communities forever changed.

If a victim consents, the Court may also make restitution in services in lieu of money, or make restitution to a person or organization designated by a victim. If you are interested in this option, please explain.

The loss of my son has resulted in financial strain, including funeral expenses, counseling costs, and time away from work. I have also used personal resources to support advocacy and community outreach efforts.

Please list your actual financial losses from this crime. List only those items for which you have not been or do not expect to be repaid. Please attach receipts or other records that document your losses whenever possible. Please differentiate any monies already repaid by a defendant.

The loss of my son resulted in significant financial hardship. Expenses include funeral and burial costs, memorial services, and related end-of-life arrangements. I have also incurred ongoing costs for grief counseling and mental health support.

Additionally, I have experienced lost income due to time away from work as I navigated the emotional and logistical impact of my son's passing. I have also used personal funds to support advocacy, awareness efforts, and community outreach through my foundation in honor of my son.

At this time, I have not been reimbursed for these expenses.

Have you been assessed any additional taxes, penalties, or interest by the federal government as a result of this case? If yes, please explain.

No

Have you or anyone on your behalf initiated civil action against any party as a result of this offense? If yes, please state the case name, docket number and court of jurisdiction.

No

If you have suffered any other expenses as a result of this crime, please list them below. Include such items as counseling, medical bills, lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense. Please be specific and attach copies of receipts if possible.

Funeral and burial costs

Grief counseling and mental health services

Lost wages due to time away from work

Transportation costs related to memorial arrangements and advocacy efforts

Costs associated with community outreach, awareness events, and prevention initiatives through my foundation

These expenses have placed both emotional and financial strain on me and my family. The financial impact is ongoing, but no amount of money can ever compensate for the loss of my child.